CLEVELAND BAR ASSOCIATION v. KODISH.

[Cite as *Cleveland Bar Assn. v. Kodish,*
110 Ohio St.3d 162, 2006-Ohio-4090.]

(No. 2005–1585—Submitted January 25, 2006—Decided August 23, 2006.)

---

**Per Curiam.**

{¶ 1} Respondent, Joan Allyn Kodish of Cleveland, Ohio, Attorney Registration No. 0013377, was admitted to the practice of law in Ohio in 1979. On November 2, 2004, relator, Cleveland Bar Association, charged respondent in an amended multicount complaint with professional misconduct. A panel of the Board of Commissioners on Grievances and Discipline heard the cause and made findings of misconduct, which the board adopted, and a recommendation, which the board modified.

## Misconduct

{¶ 2} Respondent is the sole shareholder of the Law Offices of Joan Allyn Kodish, L.P.A., and practices principally in consumer bankruptcy law. From 1994 through 2002, respondent was involved in over 530 bankruptcy cases as counsel for the debtor. She also served as counsel for debtors or debtors-in-possession in eight Chapter 11 cases.

{¶ 3} Relator charged respondent with 12 counts of Disciplinary Rule violations for incidents occurring from 1998 through 2004 and a 13th count for respondent's failure to cooperate in the disciplinary investigation in violation of Gov.Bar R. V(4)(G). The panel and board dismissed the sixth count of the complaint, finding no clear and convincing evidence to support the alleged misconduct, and relator does not object to this determination. The board also found that relator did not present clear and convincing evidence to support Count IV, which charged respondent with retaining unearned fees, or Count VII, which charged respondent with a conflict of interest arising from an intimate relationship with a client's representative. Relator does object to these findings and to the board's failure to find more evidence, relative to Count XIII, of respondent's failure to cooperate in the investigation of her misconduct.

### Count I—Martin

{¶ 4} Theresa Martin paid respondent $900 in August 1999 to file a bankruptcy petition. Respondent filed a Chapter 7 petition on Martin's behalf. Martin wanted to keep her automobile from her creditors, so respondent told her to have the automobile appraised. On November 29, 1999, respondent wrote to remind Martin to obtain an appraisal. Martin did not obtain the appraisal until December 8, 1999.

{¶ 5} In October 1999, however, the bankruptcy trustee moved for an order for Martin to turn over her vehicle or to pay the nonexempt value to the court, and respondent did not respond to the bankruptcy trustee's motion. On November 5, 1999, the bankruptcy court granted the trustee's motion and ordered Martin to surrender the vehicle.

{¶ 6} On December 3, 1999, the trustee filed a complaint to set aside the ordered discharge of Martin's financial obligations, citing Martin's failure to turn over the automobile or its value. Respondent did not answer the complaint or otherwise appear on Martin's behalf. On February 18, 2000, the bankruptcy court entered a default judgment against Martin, denying her a discharge of her debts.

{¶ 7} Martin had repeatedly telephoned respondent's office before the default judgment was granted, but she was unable to reach her, and respondent did not return any of the calls. Respondent did not testify at the hearing to explain her inaction. Her attorney, however, argued that respondent was unable to help Martin because Martin waited too long before having her vehicle appraised. Respondent's counsel maintained that without the appraisal, respondent could ethically do nothing for her client.

{¶ 8} The board found one of the disciplinary violations charged against respondent in Count I. Because respondent ignored her client's efforts to communicate about the pending bankruptcy case, the board found that respondent had violated DR 6–101(A)(3) (prohibiting a lawyer from neglecting an entrusted legal matter).

### Count II—Wilkes

{¶ 9} On July 18, 2001, respondent wrote a $1,400 check to Michael Wilkes from her Interest on Lawyer Trust Accounts ("IOLTA") checking account. The check was returned for insufficient funds.

{¶ 10} The board found one of the disciplinary violations charged against respondent in Count II. By bouncing a check from her client trust account, the board found, respondent had violated DR 1–102(A)(6) (prohibiting a lawyer from engaging in conduct that adversely reflects on her fitness to practice law).

### Count III—Triangle Development

{¶ 11} Among other violations, Count III alleged that respondent represented allied companies and individuals in separate bankruptcy cases, thus simultaneously representing clients with adverse interests without the clients' informed consent, and that she also charged improper fees.

## A. Triangle and T.D.I. Fees

{¶ 12} Triangle Development Inc. ("Triangle") and T.D.I. Investment Group Partners, Inc. ("T.D.I.") retained respondent in September 1999. She agreed to represent both companies in pursuing Chapter 11 bankruptcies.

{¶ 13} In anticipation of her filing the bankruptcy petitions, respondent received two $10,000 checks: one to represent Triangle, the other to represent T.D.I. As part of her fee arrangement, respondent requested that Alfred E. Edwards III, a principal of both Triangle and T.D.I., personally guarantee payment of her fees. Respondent eventually disclosed the $20,000 fee after filing the bankruptcies, but she apparently did not disclose Edward's guarantee. Respondent did not deposit the $20,000 into her IOLTA account; however, the board found no evidence that she had not earned these amounts before payment.

{¶ 14} Respondent filed Chapter 11 bankruptcy petitions for Triangle and T.D.I. on September 28, 1999. Respondent then traded Edwards the $10,000 checks for $20,000 in cash. A & A Quality Paving & Cement Co., L.L.C. ("A & A"), a company that Edwards had formed after Triangle's and T.D.I.'s petitions were filed, made the $20,000 in cash available. Respondent agreed to represent A & A and accepted a ten percent ownership interest in the company.

## B. Montgomery Representation

{¶ 15} On September 1, 2000, respondent filed the first of three separate bankruptcy proceedings she would pursue on behalf of Brenda Montgomery. At that time, Montgomery had an ownership interest in Triangle and was listed as a creditor of the company. Respondent, however, did not amend Triangle's bankruptcy petition, in which Montgomery was named a codebtor, to disclose that she was also representing Montgomery in her bankruptcy proceedings.

{¶ 16} On September 28, 2001, while still representing Montgomery in bankruptcy, respondent faxed a letter to Montgomery proposing a financial settlement as a means to resolve undisclosed disputes that arose during respondent's representation. The letter specified that the payments to Montgomery were contingent on her promise not to file a grievance claiming professional misconduct or to initiate any criminal prosecution. The letter stated:

{¶ 17} "After much soul searching, prayer, and recriminations against myself for the problems caused to you; I want peace and mutual respect between us. Therefore, below is an outline of a proposal to assist you in starting over.

{¶ 18} "$350 per week for two years payable directly to you and for which you can have a promissory note.

{¶ 19} "Within 30–45 days, you will receive a lump sum of $5,000.00; which sum will reduce the balance owed above.

{¶ 20} "You will pay the Trustee and mortgage-holders on a regular basis from the above funds or other income.

{¶ 21} "You will release, dismiss and/or not file or otherwise pursue any and all criminal complaints and/or bar association/Supreme Court complaints against me or my firm.

{¶ 22} "Please understand that I cannot lawfully enter into an agreement unless and until we no longer have an attorney-client relationship. However, there is another route to travel to make sure that you get your settlement and a successful Chapter 13 with me as your bankruptcy attorney. I want to see the Chapter 13 move smoothly and be confirmed. Therefore, I suggest that we complete the [Chapter 13] to confirmation together. I will move the money into escrow each week as well as any lump sums. Once the [Chapter 13] is confirmed, I will withdraw as counsel, we will sign the agreement and the funds will be released to you.

{¶ 23} "This entire agreement and any discussions etc. related to it shall remain strictly confidential and shall not be disclosed to anyone."

C. Lushion White Representation

{¶ 24} Respondent also represented Lushion White, another officer and a minority shareholder of Triangle. On September 15, 2000, respondent filed a Chapter 13 voluntary bankruptcy petition on White's behalf, but there was no evidence that she disclosed to the court in the Triangle bankruptcy that she was representing White. Fifteen months later, respondent withdrew as White's counsel.

D. Subsequent Events in the Triangle Bankruptcy Case

{¶ 25} On April 17, 2001, the bankruptcy trustee moved to disqualify respondent as Triangle's counsel, in part because of the conflicting interests at stake in representing both Triangle and Montgomery. Respondent responded, advising the bankruptcy court that she had represented Montgomery between February 23, 2001, and mid-April 2001. Respondent did not disclose that she had represented Montgomery in the earlier September 2000 bankruptcy filing or that she had been representing White since September 2000. Respondent then filed a supplemental affidavit in the Triangle proceeding in which she acknowledged representing Montgomery in early 2001 but again failed to disclose that she had represented Montgomery and White since September 2000. Not until November 1, 2001, did respondent finally admit in the Triangle bankruptcy the extent to which she had represented both Montgomery and White.

E.  Financial Assistance to A & A and Family Originals

{¶ 26} While serving as counsel to A & A, respondent loaned the company approximately $60,000.  She also paid bills totaling between $5,000 and $10,000 for Family Originals Publishing Company, Inc., another company with which Edwards was involved, while representing A & A.

{¶ 27} The board found that respondent had committed four of the disciplinary violations charged in Count III.  Because she consciously tried to limit her exposure for ethical, criminal, and civil misconduct in Montgomery's case, the board found respondent in violation of DR 1–102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), 1–102(A)(6), and 6–102 (prohibiting a lawyer from attempting to limit his or her liability to a client for personal malpractice).  Because respondent had not disclosed her multiple representations to the bankruptcy court, the board found that respondent had violated DR 1–102(A)(4) (prohibiting conduct involving fraud, deceit, dishonesty, or misrepresentation).

## Count IV—Pate

{¶ 28} In 2002, Carlton Pate consulted respondent's paralegal about engaging respondent to represent his son in bankruptcy.  The paralegal advised Pate that respondent required $500 before she would work for his son.  Pate paid respondent $100 toward the $500 fee but hired other counsel before paying the balance.  When Pate requested a refund of the $100, respondent claimed that she had earned the fee and refused to return any money to Pate.

{¶ 29} Relator alleged in Count IV that respondent's failure to return Pate's $100 violated DR 9–102(B)(4) (requiring a lawyer to promptly return funds a client is entitled to receive).  The board did not find this misconduct.

## Count V—Muffley

{¶ 30} In March 2002, respondent filed a Chapter 7 bankruptcy petition on Stacy Charles Muffley's behalf.  At that time, Muffley owned a vehicle the value of which exceeded the amount of the debtor's permitted exemption.  Respondent negotiated an agreement with the bankruptcy trustee that permitted Muffley to purchase the equity in his vehicle for $2,728 with payments to be made over a period of six months.

{¶ 31} Muffley did not make the required payments.  In October 2002, the bankruptcy trustee moved for an order requiring Muffley to surrender the vehicle or pay the nonexempt value.  Muffley telephoned respondent's office more than 20 times to discuss the situation.  He was unable to reach respondent, and she did not return his calls.  Respondent did not respond to the trustee's motion.

{¶ 32} Muffley neither paid for nor surrendered his car, and in December 2002, the bankruptcy trustee filed a complaint to set aside the discharge of his financial obligations. Respondent failed to answer the complaint, and the bankruptcy trustee filed a motion for default judgment. Shortly before a hearing on the motion for default judgment, Muffley advised the bankruptcy court that he had been unable to contact respondent. Muffley later appeared at the hearing and, acting on his own behalf, resolved the issues related to his vehicle.

{¶ 33} The board found one of the disciplinary violations charged against respondent in Count V. Because respondent had ignored her client's efforts to communicate about the pending bankruptcy case, the board found that respondent had violated DR 6–101(A)(3).

### Count VII—Relationship with the Client's Representative

{¶ 34} Relator alleged in Count VII that while representing Triangle and T.D.I., respondent engaged in a consensual sexual relationship with Edwards, the clients' representative and a principal of both corporations. Respondent admitted the relationship, but the board found insufficient evidence to prove violations of DR 1–102(A)(6) and 5–101(A)(1) (prohibiting a lawyer, except with client consent after full disclosure, from accepting employment where the lawyer's and client's interests may reasonably conflict and compromise the lawyer's independent judgment on the client's behalf).

### Count VIII—Boyles

{¶ 35} In March 2000, respondent filed a Chapter 13 bankruptcy petition on Susan Boyles's behalf. The bankruptcy plan called for Boyles to make a monthly payment of $350 to the trustee for 60 months. Boyles made the payments as required.

{¶ 36} In 2003, Boyles attempted to contact respondent about the amount necessary to complete her compliance with the reorganization plan. Boyles testified that she called respondent's office three to four times a day, every weekday, for almost four months trying to get the payoff figure. She was able to talk to respondent only three or four times during that period and never did discover the payoff amount from respondent.

{¶ 37} Boyles eventually found the payoff amount by calling the bankruptcy court directly. Boyles had estimated that she owed $3,000 and was astonished to learn that the payoff amount was approximately $16,000. Someone in respondent's office then contacted Boyles and told her that the payoff amount was $14,000. Boyles ultimately engaged another attorney and paid approximately $15,000 to fulfill the reorganization plan. Respondent never explained the discrepancy.

{¶ 38} The board found one of the allegations charged against respondent in Count VIII. Because respondent had ignored her client's efforts to communicate about the pending bankruptcy case, the board found that respondent had violated DR 6–101(A)(3).

### Count IX—The Lees

{¶ 39} In April 2001, respondent filed a Chapter 13 bankruptcy petition on behalf of Peyton and Lorie Lee. The petition was dismissed in August 2001 due to a lack of funding for the debt-reorganization plan. In September 2001, respondent moved to reinstate the debt-reorganization plan, and the bankruptcy court granted her motion. The plan provided that the Lees would make their home-mortgage payments directly to the lender rather than through the bankruptcy trustee. Respondent told the Lees to send the monthly mortgage payments to their mortgage company's counsel.

{¶ 40} The Lees followed respondent's instructions and in early 2002 began sending certified checks monthly by mail to their lender's counsel. These checks were not always mailed on time, causing the Lees to incur other additional charges and making the amount of their checks insufficient to pay the accrued penalties.

{¶ 41} In late 2002 or early 2003, Peyton realized that some of the mortgage checks had not cleared his bank. He began calling respondent daily to find out why. Respondent did not return Peyton's calls. In October 2002, the Peytons wrote respondent to ask why the checks were missing. In May 2003, Peyton learned that the lender's counsel had returned the mortgage checks to respondent, and someone in her office had inexplicably placed the unredeemed checks in the Lees' file.

{¶ 42} In September 2002, the bankruptcy court granted the Lees' lender final relief from the automatic stay, and the lender filed a complaint against the Lees to foreclose on their mortgage. As of the panel hearing, the lender's complaint was pending before the Cuyahoga County Court of Common Pleas.

{¶ 43} The board found one of the disciplinary violations alleged in Count IX. Because respondent ignored her clients' efforts to communicate about their pending bankruptcy case, the board found respondent in violation of DR 6–101(A)(3).

### Count X—Freeman

{¶ 44} In April 1998, respondent filed a Chapter 13 bankruptcy petition on behalf of Connie Freeman. The debt-reorganization plan was originally funded through deductions by Freeman's employer. In October 2000, however, Freeman changed jobs and needed to change the wage order. She telephoned respondent

several times and visited her office on one occasion, but she was never able to speak with respondent. On her own initiative, Freeman began making the required payments directly to the trustee.

{¶ 45} In 2003, when Freeman thought that she was about to complete her compliance with the reorganization plan, Freeman called the bankruptcy court to see when she would make her last payment. Freeman learned that after making payments for 60 months, she still had another 38 months to go. Freeman called respondent's office again after this discovery, but respondent still did not return her calls.

{¶ 46} Freeman finally went to see respondent in January or February 2003. When they met, respondent told Freeman that the information given to Freeman by the bankruptcy court was a mistake, that there was nothing to worry about, and that respondent would take care of everything. In April 2003, the bankruptcy court notified respondent and Freeman that Freeman had not completed the terms of her reorganization plan in the time allotted by law and that her case would be dismissed. Freeman immediately called respondent's office about the notice. On respondent's instruction, Freeman faxed the notice to respondent and called right back. She received no answer except the answering machine, although she kept calling for about one hour.

{¶ 47} The board found one of the disciplinary violations alleged in Count X. Because respondent did not attend to her client's request for assistance, the board found respondent in violation of DR 6–101(A)(3).

### Count XI—Buffington

{¶ 48} In October 2003, respondent filed a Chapter 7 voluntary bankruptcy petition on Andrea Buffington's behalf. Buffington told respondent that she was involved in a lawsuit stemming from an automobile accident. Respondent did not disclose the lawsuit in the bankruptcy petition. In November 2003, Buffington revealed the accident and lawsuit under examination by the bankruptcy trustee.

{¶ 49} In February 2004, respondent filed an amended statement of financial affairs in the Buffington bankruptcy, claiming an exemption of $5,000 of the proceeds from the pending lawsuit. The trustee objected to the claim, and respondent did not oppose the objection. The bankruptcy court sustained the objection, and Buffington's $4,200 share of the settlement proceeds from the lawsuit were consequently paid to the trustee, not to Buffington under an exemption.

{¶ 50} Buffington called respondent's office every day for three weeks and left voice mail messages asking respondent to call her about the settlement proceeds. Respondent did not return any of the calls.

{¶ 51} The board found one of the disciplinary violations charged in Count XI. Because respondent had ignored her client's efforts to communicate with her, the board found respondent in violation of DR 6–101(A)(3).

### Count XII—Early Mae White

{¶ 52} In December 2003, respondent filed a Chapter 7 voluntary bankruptcy petition for Early Mae White. In March 2004, one of White's creditors, Town and Country Investments, Inc., moved for relief from the automatic stay. Respondent did not oppose the creditor's motion, nor did she appear at the hearing on the motion, and Town and Country was granted relief from the automatic stay. White repeatedly telephoned respondent's office and left messages, attempting to understand why her debt was not discharged, but respondent did not return her calls.

{¶ 53} The board found one of the disciplinary violations alleged in Count XII. Because respondent ignored her client's requests for assistance, the board found a violation of DR 6–101(A)(3).

### Count XIII—Lack of Cooperation

{¶ 54} On May 2, 2003, relator asked respondent for a written response to the Freeman grievance but did not receive a reply. Relator directed a second letter of inquiry to respondent on May 19, 2003, and again did not receive a reply. The board found that respondent had thereby violated Gov.Bar R. V(4)(G).

### Recommended Sanction

{¶ 55} In recommending a sanction for these instances of misconduct, the board weighed the mitigating and aggravating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). In mitigation, the board found that respondent had no prior record of professional discipline. BCGD Proc.Reg. 10(B)(2)(a).

{¶ 56} The weight of respondent's prior unblemished record, however, was offset by many aggravating factors. The board found that respondent had acted out of self-interest in trying to exonerate herself from any possible liability to Brenda Montgomery. BCGD Proc.Reg. 10(B)(1)(b). Respondent also engaged in a pattern of neglect involving numerous clients and committed multiple offenses. BCGD Proc.Reg. 10(B)(1)(d). Moreover, although she eventually retained counsel and defended herself appropriately, respondent initially ignored relator's investigatory efforts, an aggravating factor under BCGD Proc.Reg. 10(B)(1)(e).

{¶ 57} In addition, because respondent did not testify at the panel hearing and her counsel argued that she had no power to help those clients who had not followed her instructions, the board found that respondent had not acknowledged her wrongdoing. BCGD Proc.Reg. 10(B)(1)(g). The board noted, however, that respondent had stipulated to most of the facts underlying the charged misconduct.

{¶ 58} The board further found as an aggravating factor that respondent had left her vulnerable bankruptcy clients adrift in their financial distress. BCGD Proc.Reg. 10(B)(1)(h). As examples, the board cited the Lees' potential loss of their home to foreclosure proceedings, Boyles's inability to sell her condominium after her failed bankruptcy proceedings, and the fact that Buffington did not receive the settlement proceeds from her lawsuit.

{¶ 59} As to other mitigating factors, the board did not find that restitution was warranted despite some evidence to the contrary. Also, despite some evidence to the contrary, the board did not find that respondent's conduct resulted from mental illness or chemical dependency, or that respondent's character-reference letters established her good reputation. See BCGD Proc. Reg. 10(B)(1)(i) and (2)(e) and (g).

{¶ 60} Relator advocated permanent disbarment. In the alternative, relator proposed that respondent's license to practice law be indefinitely suspended with reinstatement, if any, to be subject to conditions, including a two-year monitored probation. Respondent proposed a public reprimand.

{¶ 61} The panel recommended that respondent be suspended from the practice of law for one year, with the entire suspension stayed, provided that during the stayed suspension (1) respondent commit no further misconduct, (2) she complete a course of continuing legal education on law-office management, and (3) her practice be monitored by an attorney appointed by relator. The board modified the panel's recommendation, citing the "number of violations and the consequent harm to her clients." The board recommended that respondent be suspended from the practice of law for one year, with six months stayed upon the conditions contained in the panel report.

## Review

{¶ 62} Respondent does not object to the board's findings of misconduct or its recommended sanction. Relator, however, objects to both, arguing that the board overlooked evidence of misconduct relative to Counts IV, VII, and XIII. Relator also argues that respondent's misconduct warrants either indefinite suspension or disbarment.

{¶ 63} On review, we find that clear and convincing evidence establishes respondent's violations of DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 6–101(A)(3),

and 6–102, as found by the board. We therefore adopt the board's findings as to those violations. For the reasons that follow, we also find that relator's objections are well taken.

{¶ 64} As to Count IV, the evidence established that respondent's paralegal told Pate that respondent would not work until Pate paid the quoted $500 fee and that Pate did not pay the full fee. Respondent has offered nothing to suggest that she acted contrary to her agent's representation by earning any part of the $100 fee. We therefore find that respondent violated DR 9–102(B)(4).

{¶ 65} With respect to Count VII, respondent engaged in a consensual sexual relationship with Edwards, the clients' representative and a principal of both corporations, while representing Triangle and T.D.I. Respondent admitted the relationship, but the board found insufficient evidence to prove violations of DR 1–102(A)(6) and 5–101(A)(1). We disagree.

{¶ 66} We have consistently disapproved of lawyers engaging in sexual conduct with clients where the sexual relationship arises from and occurs during the attorney-client relationship. A lawyer's sexual involvement with a client has warranted a range of disciplinary measures depending on the relative impropriety of the situation, including actual suspension from the practice of law. See *Disciplinary Counsel v. Krieger,* 108 Ohio St.3d 319, 2006-Ohio-1062, 843 N.E.2d 765. Where an affair is legal and consensual and has not compromised client interests, however, we generally impose a public reprimand. *Disciplinary Counsel v. Moore,* 101 Ohio St.3d 261, 2004-Ohio-734, 804 N.E.2d 423, ¶ 12, citing *Disciplinary Counsel v. DePietro* (1994), 71 Ohio St.3d 391, 643 N.E.2d 1145; *Disciplinary Counsel v. Paxton* (1993), 66 Ohio St.3d 163, 610 N.E.2d 979; and *Disciplinary Counsel v. Ressing* (1990), 53 Ohio St.3d 265, 559 N.E.2d 1359.

{¶ 67} The relationship between respondent and her client apparently arose after she agreed to become counsel for Triangle and T.D.I., but relator has not shown that respondent's clients were damaged by the relationship. Even so, respondent's involvement with Edwards violated DR 5–101(A)(1) and DR 1–102(A)(6).

{¶ 68} As to Count XIII, the board found that respondent had failed to cooperate during the investigation of the Freeman grievance. Relator insists that respondent is also accountable on charges that she did not cooperate in the investigations of the Wilkes, Muffley, and Pate grievances. We agree, inasmuch as the parties stipulated or respondent conceded that she repeatedly did not respond to letters or telephone calls inquiring about these clients' allegations. Respondent therefore committed multiple violations of Gov.Bar R. V(4)(G).

## The Appropriate Sanction

{¶ 69} We have consistently held that unless mitigating circumstances dictate a lesser sanction, neglect of legal matters and the failure to cooperate in an ensuing

disciplinary investigation warrant an indefinite suspension from the practice of law. *Columbus Bar Assn. v. Torian*, 106 Ohio St.3d 14, 2005-Ohio-3216, 829 N.E.2d 1210, ¶ 17, citing *Disciplinary Counsel v. Treneff*, 104 Ohio St.3d 336, 2004-Ohio-6562, 819 N.E.2d 695, ¶ 16. Accord *Disciplinary Counsel v. Tyack*, 107 Ohio St.3d 35, 2005-Ohio-5833, 836 N.E.2d 568; *Cincinnati Bar Assn. v. Kieft* (2002), 94 Ohio St.3d 429, 763 N.E.2d 1167; and *Cleveland Bar Assn. v. Judge* (2002), 94 Ohio St.3d 331, 763 N.E.2d 114. No sufficiently extenuating circumstances are present here.

{¶ 70} Respondent neglected clients' bankruptcy cases and compounded her misdeeds by ignoring relator's disciplinary inquiries. She also persisted in representing bankruptcy clients with competing interests and without the requisite notice to the bankruptcy court, had an affair with a client's representative during bankruptcy proceedings, failed to properly maintain funds in her client trust account, refused to account for a bankruptcy client's fee, and negotiated with a bankruptcy client to limit her liability for professional misconduct. This chronic indifference to her clients' interests belies the character references she presented and her heretofore unblemished career. Moreover, respondent's failure to prove any further mitigating factors and her failure to show appreciation for the breadth of her transgressions support the sanction we ordinarily impose for misconduct of this magnitude.

{¶ 71} For these reasons, respondent is indefinitely suspended from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, LUNDBERG STRATTON, O'CONNOR and LANZINGER, JJ., concur.

O'DONNELL, J., dissents.

---

**O'DONNELL, J., dissenting.**

{¶ 72} I respectfully dissent. In this case, I would follow the recommendation of the Board of Commissioners on Grievances and Discipline, impose a one-year suspension with six months stayed, and require appropriate mental-health counseling for the respondent.

---

Walter & Haverfield, L.L.P., and Darrell A. Clay; and Squire, Sanders & Dempsey, L.L.P., and Colin R. Jennings, for relator.

Law Offices of Lester S. Potash and Lester S. Potash, for respondent.