[This opinion has been published in *Ohio Official Reports* at 77 Ohio St.3d 385.]

OFFICE OF DISCIPLINARY COUNSEL *v.* YAJKO.

[Cite as *Disciplinary Counsel v. Yajko*, 1997-Ohio-263.]

*Attorneys at law—Misconduct—Indefinite suspension—Misappropriation of funds from law firm over a prolonged period—Enaging in conduct involving dishonesty, fraud, deceit, or misrepresentation—Engaging in conduct that adversely reflects on fitness to practice law.*

(No. 96-524—Submitted September 25, 1996—Decided Febreuary 5, 1997)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 95-40.

_____

I. CHARGES

{¶ 1} On June 5, 1995, relator, Office of Disciplinary Counsel, charged respondent, Mark A. Yajko of East Liverpool, Ohio, Attorney Registration No. 0006348, with twenty counts of professional misconduct. In particular, it was alleged in each count that respondent violated DR 1-102(A)(4) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) and 1-102(A)(6) (engaging in conduct that adversely reflects on his fitness to practice law). The respondent stipulated to the violations of the Disciplinary Rules in each count, all of which pertained to misappropriation of funds from respondent's employer, Aronson, Fineman & Davis Co., a law firm. A brief summary of the twenty counts that were stipulated to, which includes the dates and amount misappropriated and the pattern of deception, follows:

(1) January 1990-January 1991, $1,150:  Client made three payments for fees, with respondent depositing only some of the fees into his firm's office account, keeping the balance, and preparing false receipts to cover the discrepancies; (2) March 1994-July 1994, $429:  Social Security claim fee check

cashed, respondent keeping some of fee and altering amount of his firm's fee on file; (3) August 1994, $1,250: client persuaded to write a second check based on "mix-up" of fees, which respondent then personally cashed without deposit to his firm's account (mother of client unwittingly involved in scheme); (4) May 1992-July 1992, $750: similar scheme involving Social Security fee checks with respondent depositing only part of the funds received into his firm's account; (5) July 1994, $750: respondent received bankruptcy fees but indicated on his firm's client file that the work was *pro bono*; (6) February 1992-March 1992, $361: respondent received check from Columbiana County Court for defense counsel fees for $561—only $200 of the $561 was credited to the firm for services provided to the defendant, respondent keeping the balance; (7) September 1994-November 1994, $150: respondent in handling bankruptcy matter altered his firm's accounting records to reflect less paid by client than firm actually received; (8) June 1993-November 1994, $459: similar scheme involving respondent's appointment as defense counsel, with less reported to his firm than fees received from court; (9) October 1994, $300: similar scheme regarding guardianship fees where less was deposited to his firm's account than was actually received; (10) January 1993-October 1993, $300: similar pattern of less deposited to respondent's firm's account than fees earned by him as estate administrator; (11) June 1994, $126.76: respondent cashed check received by his firm as fees for commissioner of estate without deposit to firm's account; (12) September 1991-November 1993, $1,000: attorney fees received for handling an estate with less deposited in respondent's firm's account than was received as fees (some question whether respondent received more money from client than he was authorized to receive); (13) May 1991, $120: respondent issued estate check to himself, which he cashed as payment of attorney fees without deposit to his firm's account; (14) January 1993-April 1994, $400: same pattern of receiving fiduciary fees without deposit to firm's account; (15) January 1993-April 1993, $370: same pattern of receiving fiduciary

fees without deposit to firm's account; (16) June 1994-November 1994, $726: similar pattern of receiving attorney fees in estate and depositing only some of the checks to firm's account; (17) November 1994-January 1995, $1,000: conversion of attorney fees for estate with respondent cashing check received from fiduciary and keeping the funds; (18) November 1992-July 1994, $750: only part of attorney fees received from new client deposited into firm's account; (19) May 1994-February 1995, $400: respondent prepared false time-statement to reflect more hours billed than worked, and appropriated the difference; (20) January 1988-January 1989, $200: respondent deposited less to his firm's account than he received as attorney fees for handling an estate.

{¶ 2} On October 20, 1995 the Board of Commissioners on Grievances and Discipline of the Supreme Court ("board") heard the matter essentially to consider respondent's statement of mitigation.

## II. FACTS

{¶ 3} Respondent worked for the law firm of Aronson, Fineman & Davis Co., L.P.A. ("Aronson") for twelve years. During the last seven years of employment with Aronson, respondent stole funds from Aronson. The thefts pertained to twenty separate instances, each involving a different client. Respondent stole a total of $21,402.57 from his former employer, Aronson. The missing funds were discovered by Aronson after it instituted a new accounting system. Respondent then confessed his theft of Aronson's funds. Respondent then contacted the relator, and confessed his wrongdoings. Prior to his dismissal, respondent earned approximately $40,000 to $44,000 per year.

## III. MITIGATION

{¶ 4} At the October 20, 1995 hearing before the board, respondent submitted the following evidence in hopes of mitigating any sanction that the board might impose: He grew up in a working-class family. He was the first of his extended family to receive a graduate degree. After graduating from Duquesne

University School of Law, respondent became an associate for his former employer, Aronson. Respondent is married and has a wife and two children. Respondent's wife does not work. Respondent is active in the community. He was the treasurer of the Lions Club, and is a member of the Elks and a member of the school board and credits himself with improving the financial status of the local school district.

{¶ 5} During questioning in the mitigation hearing, the respondent alleged that his family lives at or below their means; that they are "average to below average income people who try to get by." In response to assistant disciplinary counsel asking if respondent, due to financial difficulties, attempted to curtail his expenses in some way, respondent stated, "I did everything I knew to do." Respondent went on to state, "You know, if we were living large and in a position to cut back, I would understand your question, but when you're barely getting by, there's almost no room to cut." Respondent claimed that one of the expenses that further precipitated his financial decline was the destruction of his boat, which allegedly caused respondent to incur replacement costs and increased insurance cost's. Respondent also cited payment of medical needs by his family.

{¶ 6} With regard to his employment with Aronson, respondent claims that Aronson did not provide an opportunity for him to become partner. He also claims that he was not provided an expense account most of the time, and was not awarded any bonuses or incentives from his employer. The respondent claimed that he did not leave Aronson despite twelve years of alleged lack of appreciation because his situation could be likened to a battered spouse syndrome in that he felt abused and trapped and unable to leave employment.

_____

*Geoffery Stern*, Disciplinary Counsel, and *Stacy M. Solochek*, Assistant Disciplinary Counsel, for relator.

*Chester, Willcox & Saxbe, J. Craig Wright* and *Donald C. Brey*, for respondent.

4

_____

**LUNDBERG STRATTON, J.**

{¶ 7} Respondent apparently has served his local community well; he has a family and apparently is remorseful of his theft of funds. He is to be commended for all the hours he contributed to improving the local school district situation. However, this does not erase the fact that he committed thefts against his former employer, Aronson. His conduct exhibited a pattern and practice of theft over a prolonged period. This pattern of conduct, along with the fact that respondent used his position as an attorney to steal the funds, makes respondent's wrongdoings particularly egregious.

{¶ 8} Respondent emphasizes the fact that he voluntarily came to the Disciplinary Counsel and confessed his thefts. After further examination, it is apparent that respondent did not "voluntarily" admit to his thefts until Aronson, apparently after instituting a new accounting system, discovered financial problems with respondent's cases. Had respondent not come forward, Aronson obviously would have. This reduces the voluntary nature of respondent's "confession." Respondent is fortunate to have escaped a felony charge.

{¶ 9} Respondent claims that his family was "barely getting by" and there was "almost no room to cut." From our examination of respondent's statement in mitigation, his claims seem to contradict that bleak financial picture presented by respondent, or else portray financial irresponsibility. Either way, neither excuse provides any justification for respondent's thefts.

{¶ 10} Respondent owned a boat which sank. He incurred cost of a replacement and increased insurance costs. This court makes absolutely no judgment on how respondent may spend his money. However, when respondent represents to this court that "there's almost no room to cut," it is perplexing to this court why respondent continued to maintain his boat especially in light of the replacement expense and increased insurance costs. This does not appear to be the

action of a family that is "barely getting by" and certainly does not carry weight as mitigation. Further, respondent's salary was $40,000 to $44,000. While not excessive, it certainly is not meager.

{¶ 11} Finally, with regard to respondent's battered-spouse syndrome analogy to his continued employment with Aronson, despite Aronson's alleged poor treatment of him, this court does not find any support for such a theory in this context. Further, even accepting the viability of such a theory, the evidence does not support such a novel proposition. Respondent's salary history shows relatively significant increases over the last three years of his employment with Aronson. By his own admission, respondent's salary in 1994 was $40,000 to $44,000; in 1993, $36,000; in 1992, $32,000. At minimum, that is at least a twenty-five percent raise over a two-year period.

{¶ 12} In *Disciplinary Counsel v. Crowley* (1994), 69 Ohio St. 3d 554, 556, 634 N.E. 2d 1008, 1009, this court stated:

" '[T]he calculated, deliberate manner in which Respondent conducted and concealed his fraudulent schemes, his gross abuse of a position of trust and responsibility for personal gain, the amount of the theft, the length of time over which the thefts occurred and a concern that Respondent's testimony offered in mitigation and justification for the thefts *** demonstrated a fundamental lack of appreciation for lawyers' ethical obligations to the profession and the public.'"

{¶ 13} In the case at bar, respondent also instituted a deliberate scheme to defraud his employer over a period of years. Further, respondent's mitigation claims for the most part are unpersuasive. Moreover, and perhaps most important, two of the incidents that respondent cited as precipitating his financial crisis, the expenses for the boat (May 1988) and his wife's surgery (1991) occurred *subsequent* to his initial misappropriation in January 1988. This raises serious credibility issues pertaining to respondent's mitigation claims.

**{¶ 14}** The relator recommended that respondent be suspended from the practice of law for a period of two years. However, the board determined that an indefinite suspension from the practice of law was a more appropriate sanction.

**{¶ 15}** Respondent committed theft, plain and simple. Further, the thefts were committed over a period of years, indicating that respondent had developed a pattern and practice of deception. Respondent also claims that his clients were not injured by the thefts. However, respondent fails to consider the embarrassment and concern that the clients endured when they were accused of not properly paying their fees. Finally, respondent's mitigation statement lacks credibility. While the respondent is to be commended for his many hours of community service, that is not sufficient to mitigate against the violation committed. Perhaps the board summed it up best in its findings of fact when it stated:

"[I]t should matter little whether the theft or misappropriation is from an attorney's partners, associates, clients, family or friend; or whether the thefts were committed brazenly or deceptively, or whether tens of thousands of dollars or a relatively small amount was misappropriated."

**{¶ 16}** Respondent's violations of DR 1-102(A)(4) and 1-102(A)(6) were stipulated. Having reviewed the record, we concur in the board's recommended sanction. Respondent is therefore suspended from the practice of law in Ohio indefinitely. Costs taxed to the respondent.

*Judgment accordingly.*

MOYER, C.J., and RESNICK, J., concur.

COOK, J., concurs in judgment only.

DOUGLAS, J., dissents.

F.E. SWEENEY and PFEIFER, JJ., dissent and would order a two-year suspension.

———————————