DISCIPLINARY COUNSEL ET AL., *v.* STURGEON.

[Cite as *Disciplinary Counsel v. Sturgeon,*
111 Ohio St.3d 285, 2006-Ohio-5708.]

(No. 2006–1209—Submitted August 8, 2006—Decided November 15, 2006.)

_____

**Per Curiam.**

{¶ 1} Respondent, Edward Francis Sturgeon of Youngstown, Ohio, Attorney Registration No. 0033744, was admitted to the Ohio bar in 1979.

{¶ 2} On October 11, 2005, relators, Disciplinary Counsel and the Mahoning County Bar Association, filed an amended complaint charging respondent with professional misconduct. Respondent filed an answer to the complaint, and a panel of the Board of Commissioners on Grievances and Discipline held a hearing on the complaint in December 2005. The panel then prepared written findings of fact, conclusions of law, and a recommendation, all of which the board adopted.

Misconduct

*Count I*

{¶ 3} In March 2003, Stephanie Fisher visited respondent's law office to discuss a child-custody matter. Fisher had never met respondent before that appointment. Early in the meeting, respondent asked Fisher to remove her jacket, and she did so. Respondent told her that she had a "nice figure" and said that she was "not as chunky" as he had first thought.

{¶ 4} Respondent told Fisher that he would require a $2,500 retainer to begin working on her case. Fisher said that she could pay $50, and she wrote a check for that amount. Respondent then advised Fisher that $50 would not even cover the court costs that she would be required to pay.

{¶ 5} Respondent asked Fisher if she would be willing to engage in oral sex. Fisher said that she would. Respondent moved Fisher's shirt and bra to expose her breasts, and he fondled her breasts while she performed oral sex on him. Afterwards, Fisher dressed herself and left respondent's office.

{¶ 6} Later in the evening, Fisher sought treatment at a medical center in Youngstown. The following day, she reported the incident to the Youngstown Police Department, and she stopped payment on the $50 check that she had given to respondent.

{¶ 7} After examining respondent's actions, the board concluded that respondent had violated the following Disciplinary Rules: DR 1–102(A)(6) (barring conduct that adversely reflects on a lawyer's fitness to practice law) and 5–101(A)(1) (prohibiting a lawyer from accepting employment if the exercise of professional judgment on behalf of a client will be or reasonably may be affected by the lawyer's personal interests).

## Count II

{¶ 8} In March 2004, Christine Killa visited respondent's law office to discuss a child-custody matter. Killa had never met respondent before that appointment. They discussed Killa's efforts to secure legal custody of her children, and respondent said that he was unsure whether he wanted to represent her. Killa offered to pay $1,000 in cash, but respondent did not accept any payment from her at that time.

{¶ 9} Killa scheduled a second appointment with respondent for the following week. The day before that second appointment, respondent left a voice-mail message for Killa telling her that he had a scheduling conflict and wanted to meet at a location other than his office. When Killa returned his call, respondent suggested that they meet at Killa's home, and she agreed.

{¶ 10} At the appointed time, respondent visited Killa's home, and he stayed for about two hours. The two of them discussed Killa's concerns about the custody of her children, and during their discussion, Killa mentioned that her ex-husband kept pornographic pictures around his house and on his computer. Killa testified at respondent's disciplinary hearing that respondent became excited when he learned that information, and he asked detailed questions about her ex-husband's sexual inclinations and habits.

{¶ 11} Respondent then walked around Killa's home, looking in all of her closets and underneath clothing. Killa testified at respondent's disciplinary hearing that she found this behavior "bizarre," but she assumed that respondent was confirming whether the home was a suitable place for Killa's children to live if she gained custody of them.

{¶ 12} Respondent entered Killa's bedroom, closed the blinds, and lay down on her bed. He then patted the mattress and asked Killa to come over and lie down next to him. Killa refused, and respondent then stood up, touched her buttocks and breasts, and tried to force her to kiss him. Killa testified at the disciplinary

hearing that she was "shocked and disgusted" by respondent's behavior, and she ran out of the bedroom and down the stairs.

{¶ 13} Respondent found Killa crying in her kitchen. He told her that he did not understand what the big deal was, adding that he did this kind of thing all the time and had helped many women with their legal troubles in exchange for their having sex with him. Killa explained at the disciplinary hearing that she did not want to have sex with respondent but did want legal help on the child-custody issue that they had discussed. Respondent told her that no one else would take her case. Killa then offered respondent $1,000, and he went out to his car to get his receipt book. When he returned, respondent made other lewd comments, such as "[y]ou have great breasts, can I see your tits? If I win your case, can I get a peek at them?"

{¶ 14} After respondent left Killa's home that day, Killa called her parents and told them what had happened. She later told the county bar association and Disciplinary Counsel as well.

{¶ 15} The board concluded that by making inappropriate sexual comments, by touching Killa in an unwanted sexual manner, by using force to attempt to compel her to kiss him, and by soliciting sex in exchange for a reduced legal fee, respondent had violated DR 1–102(A)(6) and 5–101(A)(1).

*Count III*

{¶ 16} In June 2003, Tosha McGee visited respondent's law office to discuss a wage-garnishment matter. Respondent told McGee that he would represent her if she would pay a legal fee of $300. McGee gave respondent a $100 check and asked if she could pay the balance later. Respondent agreed.

{¶ 17} Respondent asked McGee, an African–American, if she had ever thought about dating a white man. McGee said no, and respondent asked her why not. Respondent asked McGee if she had "ever given head" or "ever sucked a dick." He also asked McGee, "[D]o you want to give me head?" McGee answered no, and respondent asked her why not. He then closed the door to his office where they were meeting.

{¶ 18} Respondent next asked McGee if she wanted "to see it," and he unzipped his pants, removed his penis, and asked whether McGee wanted to touch it. McGee declined, looked away, and tried to move her chair. Respondent then zipped his pants, returned to his chair behind his desk, and continued to discuss McGee's case.

{¶ 19} The board found that respondent had violated DR 1–102(A)(6) and 5–101(A)(1).

## Sanction

{¶ 20} In recommending a sanction for this misconduct, the board considered the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). As aggravating factors, the board found that respondent had acted with a dishonest or selfish motive, engaged in a pattern of misconduct, committed multiple offenses, failed to cooperate fully in the disciplinary process, made false statements during the disciplinary process, failed to apologize or express remorse for his actions, and caused harm to vulnerable victims. BCGD Proc.Reg. 10(B)(1)(b), (c), (d), (e), (f), (g), and (h).

{¶ 21} Mitigating factors identified by the board included evidence as to respondent's good character or reputation and his lack of any prior disciplinary record. BCGD Proc.Reg. 10(B)(2)(a) and (e). The board noted that respondent has been diagnosed as suffering from a generalized anxiety disorder with schizoid and avoidant personality features, but the board found no evidence that this problem caused the episodes of sexual misconduct described above.

{¶ 22} Relators recommended that respondent be indefinitely suspended from the practice of law. The panel and the board issued similar recommendations.

{¶ 23} We have reviewed the board's report and the record, and we find that respondent violated all of the provisions as described above. We conclude, however, that a more severe sanction than the one recommended by the board is warranted. Respondent must be permanently disbarred for his egregious professional misconduct.

{¶ 24} First, respondent's actions were rude, offensive, and thoroughly unprofessional. He used the attorney-client relationship to gratify his own sexual interests rather than focusing on the legal needs of his clients. His crude behavior would not be acceptable in any social setting, and it was outrageously inappropriate in the midst of an attorney-client relationship. Respondent preyed on women who were in vulnerable legal and financial circumstances, and he tried to seduce them for his own selfish gratification.

{¶ 25} Second, lawyers must always exercise independent professional judgment and render candid advice to their clients. A lawyer who attempts to engage in a sexual relationship with a client—particularly when the client is clearly not interested in that kind of relationship—puts the lawyer's own personal feelings ahead of the objectivity that must be the hallmark of any successful attorney-client relationship. By repeatedly initiating sexual conduct with clients, respondent called into serious doubt his commitment to a profession in which the clients' interests must always come first.

{¶ 26} As we have explained, " 'The attorney stands in a fiduciary relationship with the client and should exercise professional judgment "solely for the benefit of the client and free of compromising influences and loyalties." [Wisconsin's Rules of Professional Conduct 20.23(1).] By making unsolicited sexual advances to a client, an attorney perverts the very essence of the lawyer-client relationship. Such egregious conduct most certainly warrants discipline.' " *Disciplinary Counsel v. Moore*, 101 Ohio St.3d 261, 2004-Ohio-734, 804 N.E.2d 423, ¶ 15, quoting *In re Disciplinary Proceedings Against Gibson* (1985), 124 Wis.2d 466, 474–475, 369 N.W.2d 695.

{¶ 27} Finally, respondent not only committed multiple outrageous sexual misdeeds with clients, but he also lied repeatedly during the disciplinary process. The panel was in a strong position to evaluate his credibility during two days of hearings on the relators' disciplinary complaint, and that panel described him as "frequently evasive and argumentative." According to the panel, respondent lied under oath, engaged in a pattern of deception that was designed to disrupt the disciplinary process, and was even willing to blame and slander his clients "in the interest of self preservation." Respondent's dishonesty about his misconduct and his willingness to blame his clients rather than accept responsibility for his own actions demonstrates that he is no longer fit to practice a profession grounded on candor, integrity, loyalty, and fairness.

{¶ 28} "We have consistently disapproved of lawyers engaging in sexual conduct with clients where the sexual relationship arises from and occurs during the attorney-client relationship. A lawyer's sexual involvement with a client has warranted a range of disciplinary measures depending on the relative impropriety of the situation, including actual suspension from the practice of law." *Cleveland Bar Assn. v. Kodish*, 110 Ohio St.3d 162, 2006-Ohio-4090, 852 N.E.2d 160, ¶ 66.

{¶ 29} As the panel concluded, the many aggravating factors in this case "outweigh if not overwhelm" the mitigating factors. Because those factors tip so decidedly in favor of a more severe sanction, because respondent committed multiple offenses with multiple victims over the course of many months, and because he expressly tried to leverage his clients' financial and legal vulnerabilities to gratify his own sexual desires and then lied under oath and blamed his victims to hide his wrongdoing, we conclude that respondent's shameful and selfish misconduct warrants our most severe sanction.

{¶ 30} Accordingly, respondent is hereby permanently disbarred from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., RESNICK, PFEIFER, O'CONNOR, O'DONNELL and LANZINGER, JJ., concur.

LUNDBERG STRATTON, J., concurs in part and dissents in part.

**LUNDBERG STRATTON, J.,** concurring in part and dissenting in part.

{¶ 31} While I agree with the finding of misconduct in the majority opinion, I disagree as to the sanction. The relators, the panel, and the board all recommended an indefinite suspension. They had the best opportunity to judge respondent's character and the possibility of his rehabilitation. I would adopt their recommendations of indefinite suspension, coupled with professional therapy and written apologies to the victims. The respondent may never satisfy the second condition for reinstatement of being able to rehabilitate himself, but apparently the relators, the panel, and the board felt he ought to be given that opportunity. Disbarment denies respondent that chance forever. While his conduct is despicable, and it is emotionally easy to justify disbarment, I believe disbarment is not objectively consistent with our cases involving more severe disciplinary conduct, although not of a sexual nature, in which we have given lawyers a second chance. Therefore, I dissent as to the sanction.

---

Jonathan E. Coughlan, Disciplinary Counsel, and Lori J. Brown, First Assistant Disciplinary Counsel, for relator Disciplinary Counsel.

Ronald E. Slipski and David C. Comstock Jr., for relator Mahoning County Bar Association.

Mary Jane Stephens and John B. Juhasz, for respondent.