CLEVELAND METROPOLITAN BAR ASSOCIATION *v.* LOCKSHIN.

[Cite as *Cleveland Metro. Bar Assn. v. Lockshin*,

125 Ohio St.3d 529, 2010-Ohio-2207.]

*Attorneys — Misconduct — Inappropriate touching of and sexual remarks to clients and others — Failure to file timely notice of appeal in criminal case — Indefinite suspension.*

(No. 2010-0025 — Submitted February 24, 2010 — Decided May 25, 2010.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 08-062.

_____

**Per Curiam**.

**{¶ 1}** Respondent, Andrew C. Lockshin of Fremont, Ohio, Attorney Registration No. 0075708, was admitted to the practice of law in Ohio in 2002. The Board of Commissioners on Grievances and Discipline recommends that we suspend respondent's license to practice indefinitely based upon its findings that he committed multiple violations of the Code of Professional Responsibility and Rules of Professional Conduct by engaging in a pattern of inappropriate sexual communication and behavior with a number of women, including his clients, and failing to file a timely notice of appeal on behalf of a client.[1]

**{¶ 2}** We accept the board's findings that respondent violated ethical standards incumbent on Ohio lawyers. We agree with the board that an indefinite suspension is necessary to protect the public from further misconduct by respondent.

_____

1. Relator charged respondent with misconduct pursuant to applicable rules for acts occurring before and after February 1, 2007, the effective date of the Rules of Professional Conduct, which superseded the Code of Professional Responsibility.

**Procedural History**

{¶ 3}   In January 2007, three Sandusky County judges filed a grievance with Disciplinary Counsel after receiving reports that respondent had touched the breast of one client and made inappropriate sexual comments to several other clients and a potential witness. The Board of Commissioners on Grievances and Discipline referred the grievance to relator, Cleveland Metropolitan Bar Association.

{¶ 4}   After filing the grievance, the judges met with respondent and conducted an intervention with the assistance of Scott Mote of the Ohio Lawyers' Assistance Program ("OLAP").  As a result, on January 30, 2007, respondent entered into a four-year OLAP contract that required him to obtain a mental-health assessment and to participate in any recommended treatment.

{¶ 5}   In August 2008, relator filed a seven-count complaint alleging that respondent violated DR 1-102(A)(3), 1-102(A)(4), 1-102(A)(6), and 7-102(A)(5) by engaging in inappropriate sexual communications with a potential witness, a law-enforcement officer, and multiple clients and by falsely denying any misconduct.  Relator later amended its complaint to add an eighth count, alleging that by failing to file a timely appeal on a client's behalf, respondent violated Prof.Cond.R. 1.3, 8.4(d), and 8.4(h).

{¶ 6}   Respondent denied most of the allegations against him.  However, after conducting significant pretrial discovery, the parties stipulated that by engaging in inappropriate sexual communications with five clients, a potential witness, and a sergeant from the Sandusky County Sheriff's Department, respondent committed seven violations of DR 1-102(A)(6) (engaging in conduct that adversely reflects on the lawyer's fitness to practice law).  The parties further stipulated that by failing to timely file a notice of appeal on a client's behalf, respondent violated Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client) and 8.4(d) (prohibiting conduct prejudicial to

the administration of justice). The parties agreed that the appropriate sanction for respondent's misconduct is a two-year suspension, with 18 months stayed upon conditions.

{¶ 7} The panel, however, rejected the parties' agreed stipulations and informed the parties that it would proceed to hearing. On the day of the hearing, relator voluntarily dismissed the alleged violations of DR 1-102(A)(3), 1-102(A)(4), and 7-102(A)(5), and Prof.Cond.R. 8.4(h).

{¶ 8} The panel heard the testimony of respondent, a former client, and Stephanie Krznarich, clinical director for OLAP. Additionally, the panel considered numerous depositions, respondent's OLAP contract, medical records from Behavioral Connections (a behavioral treatment center), the parties' stipulations, and four written character references.

{¶ 9} The panel issued findings of fact, concluded that respondent had committed the violations as stipulated by the parties, and recommended that respondent be indefinitely suspended from the practice of law. The board adopted the panel report in its entirety, and neither party has filed objections.

**Misconduct**

*Count One*

{¶ 10} Respondent was appointed to represent a 16-year-old female in a juvenile matter. During that representation, respondent frequently called the girl and asked her personal questions that were entirely unrelated to her case. After resolving her case, respondent used instant messaging to initiate "flirtatious" conversations with the girl that later turned sexual. Because they both used screen names, the girl did not initially realize that she was conversing with respondent. Once she found out, the conversations stopped.

{¶ 11} In late 2004, when the girl was 17 years old and incarcerated at the juvenile-detention center, the juvenile court appointed respondent to represent her in a second matter. When respondent visited her at the detention facility, he

3

engaged in inappropriate personal conversations, "played footsie" with her, touched her leg, and informed her that he was sexually aroused.

{¶ 12} Respondent initially admitted that he had engaged in instant messaging with the girl, but denied that the messages were of a sexual nature. He later admitted that he had engaged in "flirtatious" and "inappropriate" conversations with her both in person and on the Internet. But at the hearing, respondent blamed the girl for the sexual content of the instant messages and claimed that *he* had terminated the communications when *she* mentioned sex.

{¶ 13} The panel and board found that respondent's "inappropriate actions" toward this young female client violated DR 1-102(A)(6), and we accept this finding.

*Count Two*

{¶ 14} During his representation of a defendant in a criminal matter, respondent interviewed the defendant's girlfriend, who was the only favorable witness in the case. During the 90-minute interview, respondent spent only five minutes discussing the case. He spent the rest of the interview talking about himself and his workouts. He told the witness that she looked like Jessica Simpson, he displayed a large amount of cash, and he implied that he had had sex with clients. When the witness got up to leave, respondent touched a tattoo on her neck and asked her if she had any others.

{¶ 15} The next day, respondent called the witness on her cell phone and invited her to have coffee and discuss the case, but she declined. The witness's grandmother later instructed respondent never to call again because his conduct had made her granddaughter uncomfortable.

{¶ 16} In his answer, respondent denied the witness's allegations. However, at the panel hearing, he admitted that the majority of his interview with the witness involved inappropriate conversation of a "flirtatious" nature, initiated

by him and intended to impress her. The panel and board found that respondent's conduct toward the witness violated DR 1-102(A)(6), and we accept this finding.

*Count Three*

{¶ 17} Respondent admitted that while lunching with attorney Jeremiah Ray, he showed Ray photographs of a scantily clad female client. According to Ray, respondent phoned the client and asked her to send something so he would have an incentive to do well in the hearing that afternoon. At first, respondent denied that he had either requested or received another photo from a client during that lunch. He later admitted that he had asked for and received another photo from her. The panel and board found that respondent's inappropriate communication with the client violated DR 1-102(A)(6), and we accept this finding.

*Count Four*

{¶ 18} In 2004, after a woman charged with domestic violence appeared in court, respondent approached her, gave her his business card, and asked her to meet him at his office. When they met, the prospective client told him that she did not have the money to retain him, and respondent agreed to represent her for free.

{¶ 19} After the domestic-violence charges were dropped, the client asked respondent to represent her in a divorce. She testified that almost every conversation she had with respondent turned sexual. She recalled that respondent told her that (1) he wanted to meet her at a hotel to have sex, (2) talking to her on the phone sexually aroused him, (3) he would be satisfied just giving her oral sex, and (4) he wanted to see and touch her breasts. Because his conduct made her uncomfortable, the client would often take a friend to their meetings. But the last time she went to respondent's office, he cornered her, grabbed her by the arm, pushed himself up against her, put his arm around her, and tried to kiss her.

**{¶ 20}** During a third representation, respondent called the client at home every day, blocking his number so that she did not know who was calling. She also testified that he had sent her inappropriate text messages asking her to send him naked pictures and meet him at motels in Findlay.

**{¶ 21}** Respondent denied making sexual comments to the client, except on one occasion. He claimed that when she told him that a police officer had wanted to perform oral sex on her, he had responded by saying that he enjoyed that activity, too. Respondent also denied telling the client that he would like to meet her at a hotel, telling her that he was sexually aroused, asking to see or touch her breasts, trying to kiss her, and asking her to send him pictures. At the hearing, however, respondent admitted that he had asked the client to send him a picture and had attempted to kiss her. When questioned about his inconsistent testimony, he stated that his deposition testimony was true "[t]o the best of his recollection at that point," but claimed that reading the client's deposition refreshed his recollection.

**{¶ 22}** The panel and board found that respondent's conduct violated DR 1-102(A)(6), and we accept this finding.

*Count Five*

**{¶ 23}** In 2006, a woman was referred to respondent for representation in a divorce. She testified that her second meeting with respondent occurred after normal business hours and that after letting her into the building, respondent locked the front door. This conduct made the client uncomfortable because no one else was present. When she got up to leave, respondent grabbed her, massaged her shoulders, and told her everything was going to be okay.

**{¶ 24}** At another meeting, respondent scooted his chair up against the client and rubbed her leg with his hand. The client testified that respondent would call her as soon as she left his office and say that he just wanted to hear her voice. Respondent made her feel that she would lose custody of her young children if

she did not cooperate with him. But after he asked her to meet him at a hotel in Perrysburg, the client fired him and retained new counsel.

{¶ 25} Respondent initially denied the client's allegations. At his deposition, however, he admitted that he had suggested meeting her at a hotel where he was attending a seminar. At the hearing, he also admitted to having had "conversations of a flirtatious nature with her" and "massag[ing] her shoulders in a flirtatious way."

{¶ 26} The panel and board found that respondent's conduct violated DR 1-102(A)(6), and we accept this finding.

*Counts Six and Seven*

{¶ 27} Respondent represented a female client in related criminal and children-services matters. A sergeant from the Sandusky County Sheriff's Department worked at the jail where the client was incarcerated. She testified that respondent would visit his client at the jail several times a week and stay for approximately one hour. On the weekends, respondent would visit while wearing a cut-off tank top, shorts, and tennis shoes. The client complained to the sergeant about respondent's conduct. Later, she sent the sergeant a letter stating that respondent had shown her two pictures of clients who were exotic dancers, telling her that one of them wanted to pay for his services with sexual favors. In her letter, the client also revealed that respondent had suggested that they get a hotel room for a few hours.

{¶ 28} After receiving the letter, the sergeant wrote her own letter to her supervisors, reporting two inappropriate comments that respondent had made directly to her. The first incident involved respondent's claim that one of his female clients had asked him about the size of his penis. And in describing that conversation, the sergeant reported that respondent had used his hands to demonstrate how big he was. She also testified that, aware that her husband also

worked at the sheriff's department, respondent had asked her if she "pulled rank" in the bedroom.

{¶ 29} In his answer, respondent denied the allegations levied against him by both women. He later admitted that he had visited his client at the jail while wearing his workout clothes, that he had engaged in sexual conversations with her during those visits, and that he once suggested that they "should go get a hotel room." Respondent also acknowledged having a conversation with the sergeant about pulling rank at home, although he claimed that he did not mean it in a sexual way. Although he recalled that "[t]here was a discussion about [his] body," he claimed that he did not recall any details of that conversation.

{¶ 30} The panel and board found that respondent's conduct violated DR 1-102(A)(6). We accept these findings.

*Count Eight*

{¶ 31} In April 2009, respondent was appointed to represent a defendant in a criminal appeal, but he failed to file a timely notice of appeal or take any action on the defendant's behalf. Therefore, the panel and board found that respondent's conduct violated Prof.Cond.R. 1.3 and 8.4(d), and we accept these findings.

**Mental-Health Issues**

{¶ 32} In addition to the evidence regarding respondent's misconduct, the parties submitted evidence regarding respondent's mental health. Stephanie Krznarich, clinical director for OLAP, testified that she had assessed respondent after the intervention and had tentatively diagnosed him with frotteurism, a type of sexual disorder, and narcissistic-personality disorder. Because respondent had denied all of the alleged sexual conduct during that initial evaluation, Krznarich explained that she needed to turn to specialists in sexual misconduct and boundary violations to either confirm or rule out her tentative frotteurism diagnosis.

Therefore, she referred respondent to Behavioral Connections, a facility that specializes in sex-abuse issues, to obtain further evaluation and counseling.

{¶ 33} At Behavioral Connections, respondent was initially diagnosed with depressive disorder NOS (not otherwise specified) and referred for further sexual-offender evaluation and treatment. After performing a sexual-offender assessment, a clinical counselor at Behavioral Connections recommended that respondent (1) participate in a sexual-offender treatment program, (2) not work with any minor clients, and (3) not use any steroids or supplements for the purpose of enhancing muscle mass or appearance.

{¶ 34} Although respondent participated in some group counseling through Behavioral Connections, he discontinued that treatment in March 2008 in violation of his OLAP contract. The discharging clinician described respondent's unresolved problems and obstacles to continued recovery, stating that "[respondent] has refused to look more deeply into his offense cycle, insisting for several months that he had done all he needed to do in treatment, pouring energy into being discharged rather than completing treatment." The clinician further stated that respondent's prognosis at discharge was poor due to the fact that he had "not gained the tools necessary to reduce the risk of re-offense" and was "presently showing thought patterns that support reoffense." He therefore recommended that he "resume sex offender specific treatment as soon as possible."

{¶ 35} Respondent sought counsel from Bradley Smith, a licensed professional clinical counselor, in May 2008, but Smith did not specialize in sex-offender counseling. Smith diagnosed respondent as having narcissistic-personality-disorder tendencies.

{¶ 36} Smith's treatment notes reflect that respondent assured him that (1) there was no sexual contact with any of the complainants, (2) he understood he had overstepped his professional boundaries, and (3) it would not happen again.

On July 16, 2008, after meeting with respondent just six times, Smith opined that respondent's behavior was the result of poor judgment, that it would not happen again, and that additional counseling was unnecessary. At his deposition, however, Smith learned that respondent had not fully disclosed the allegations against him. Moreover, Smith acknowledged that due to respondent's narcissistic-personality tendencies, he requires excessive admiration, has a sense of entitlement, definitely exploits others for his own benefit, and, in some cases, lacks empathy for others. While he expressed his belief that respondent has "a very good shot at rehabilitating himself," he acknowledged that he would be "very apprehensive" about recommending that respondent be permitted to continue practicing law if he did not take his counseling seriously.

{¶ 37} At respondent's request, the panel continued the hearing, originally scheduled for May 18, 2009, to permit him to obtain a second sexual-offender assessment. Although respondent did not complete that assessment until after the August 31, 2009 hearing, he later submitted the assessment report for the panel's consideration. In that report, Jeffrey D. Bischoff, LSW, PC/CR, states:

{¶ 38} "In clinical interviews, [respondent] reported two major life events this calendar year, a separation and dissolution of marriage and the unexpected death of his mother, both of which he discussed without change of affect. [Respondent] expressed a realization that he needs treatment of some kind, but asserted that he does not need sex offender specific treatment and especially not group treatment. [Respondent] consistently avoided taking full responsibility for inappropriate behaviors, tending to use justification and blame.

{¶ 39} "In his polygraph examination, [respondent] appeared to be attempting to distort the chart readings when responding [to] questions about his inappropriate sexual behaviors, raising doubt about the level of honesty he is showing concerning the extent of his sexual behavior problems.

**{¶ 40}** "Currently [respondent] appears to be keeping himself from sexually inappropriate behavior. However, he is under a high level of supervision and scrutiny and a threat of loss of his license. Given the difficulty [respondent] appears to have addressing his sexually inappropriate behaviors in a fully responsible way, the high-moderate level of dynamic risk indicated by the TPS, and his high level of past and present sexual behavior, it seems that, unless adequately addressed in treatment specifically targeting sexual behaviors, [respondent's] inappropriate sexual behavior will return in some shape or form in the future."

**{¶ 41}** Bischoff recommended that respondent participate in sexual-offender treatment to gain the ability to (1) take full responsibility for his inappropriate sexual behaviors, (2) learn the impact of his inappropriate sexual behaviors on his victims, (3) identify distorted thinking, which contributed to his inappropriate sexual behaviors, (4) change distorted thinking patterns, and (5) develop a realistic and effective plan to decrease his risk of repeating inappropriate sexual behaviors. He also recommended that respondent not work with any minor clients.

### Sanction

**{¶ 42}** When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in Section 10 of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21. Because each disciplinary case is unique, we are not limited to the factors specified in the rule but may take into account "all relevant

factors" in determining what sanction to impose. BCGD Proc.Reg. 10(B). We are ever mindful that the primary purpose of the disciplinary process is not to punish the offender but to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship. *Disciplinary Counsel v. Agopian*, 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368.

{¶ 43} The parties recommend a two-year suspension of respondent's license to practice law, with 18 months stayed upon conditions, plus two years of probation upon his reinstatement. In support of this sanction, respondent cites our decisions in *Disciplinary Counsel v. Moore*, 101 Ohio St.3d 261, 2004-Ohio-734, 804 N.E.2d 423 (imposing a one-year stayed suspension and two years' probation with conditions for an attorney who made unsolicited and inappropriate sexual comments to one client and engaged in consensual sexual relations with another); *Toledo Bar Assn. v. Burkholder*, 109 Ohio St.3d 443, 2006-Ohio-2817, 848 N.E.2d 840 (imposing a six-month suspension, conditionally stayed, on an attorney who relentlessly asked a client out on dates, inappropriately touched her, and made a sexual comment); *Disciplinary Counsel v. Quatman*, 108 Ohio St.3d 389, 2006-Ohio-1196, 843 N.E.2d 1205 (imposing a one-year stayed suspension coupled with two years of probation on an attorney who put his hands on a client's breasts and made an inappropriate comment to her); and *Disciplinary Counsel v. Freeman*, 106 Ohio St.3d 334, 2005-Ohio-5142, 835 N.E.2d 26 (imposing a six-month suspension upon an attorney who paid a young female client for photographs of herself in various states of undress and requested photographs of her in the nude and sex acts from the client in exchange for money after the attorney-client relationship ended).

{¶ 44} Relator, on the other hand, notes that in *Disciplinary Counsel v. Sturgeon*, 111 Ohio St.3d 285, 2006-Ohio-5708, 855 N.E.2d 1221, we permanently disbarred an attorney for (1) engaging in sexual acts with one of his clients, (2) making inappropriate sexual comments, touching another client in a

sexual manner, and soliciting sex from her in exchange for a reduced legal fee, and (3) making inappropriate sexual comments and exposing himself to a third client.

{¶ 45} Respondent's conduct is comparable to the types of conduct engaged in by the attorneys in *Moore*, *Burkholder*, *Quatman*, and *Freeman*. However, respondent's multiple offenses, his submission of false testimony during his depositions, and his failure to follow Behavioral Connections' recommendation that he receive sex-offender-specific treatment – thereby violating the terms of his OLAP contract – render his conduct more serious than the conduct at issue in those cases. But nothing in the record shows that respondent actually engaged in sexual acts with clients, as the attorney in *Sturgeon* did.

{¶ 46} In mitigation, the parties stipulated and the board found that respondent does not have any history of prior discipline. BCGD Proc.Reg. 10(B)(2)(a). The board, however, noted that respondent sought to delay the disciplinary process, seeking a continuance just two weeks before the scheduled hearing date to obtain a second sexual-offender assessment. He also engaged in a pattern of lying in depositions. Therefore, the board rejected the parties' stipulation that respondent had cooperated throughout the investigation. See BCGD Proc.Reg. 10(B)(2)(d).

{¶ 47} Although the parties did not stipulate to any aggravating factors, the board found that respondent (1) admitted to multiple counts of misconduct, BCGD Proc.Reg. 10(B)(1)(d), (2) gave numerous false statements to investigators in depositions and in court filings, 10(B)(1)(f), and (3) engaged in behavior that had a negative impact on his clients, many of whom were vulnerable young women, 10(B)(1)(h). Additionally, we find that the eight separate counts against respondent, seven of which involve inappropriate sexual communications or conduct, demonstrate a disturbing pattern of professional misconduct. BCGD

Proc.Reg. 10(B)(1)(b). This pattern reveals respondent's selfish motive to advance his own sexual interests at his clients' expense. BCGD Proc.Reg. 10(B)(1)(c).

{¶ 48} During these disciplinary proceedings, respondent has moved from an almost categorical denial of the allegations against him to a partial admission. But even though he now admits that he committed some acts of misconduct, he continues to minimize his actions and blame the women he victimized.

{¶ 49} As the board found: "In addition to the 'misstatements' made to investigators, in depositions and in filings, Respondent failed to express any real degree of ownership of his actions. Although Respondent acknowledged his behavior was inappropriate, he avoided taking full responsibility for the inappropriate behavior, tending to justify his actions and assign blame. Respondent attempted to minimize the inappropriate behavior throughout his testimony. Responde[nt] testified [that] invitations made to the young women to rent a hotel room were 'made in jest' (Tr. 169), statements were blown out of proportion (Tr. 134), the misstatements were 'part of the denial process' (Tr. 177), his behavior toward female clients was 'flirtatious' (Tr. 194), and that 'some of the things are rather old, some of them I either don't remember or I don't agree.' (Tr. 192) This minimizing was underscored by the equivocating manner and language in which the Agreed Stipulations were drafted."

{¶ 50} Moreover, the record demonstrates that respondent has significant mental-health concerns that he has failed to address in the three years since his misconduct first came to light. In March 2008, he violated the terms of his January 2007 OLAP contract by withdrawing from his treatment at Behavioral Connections against the advice of professionals involved in his treatment. Although he obtained some counseling, the counselor he selected did not specialize in the sex-offender-specific treatment that had been recommended. While respondent now claims that he is willing to comply with his OLAP contract

and participate in whatever treatment is recommended, his pattern of failing to follow through does not inspire confidence.

{¶ 51} Because respondent has not yet received the treatment necessary to develop a realistic and effective plan to decrease his risk of repeating inappropriate sexual behaviors, he remains at risk to reoffend. Accordingly, we agree with the board's determination that the sanction recommended by the parties is not sufficient to protect the public from further misconduct. Respondent is therefore indefinitely suspended from the practice of law in Ohio and, pursuant to Gov.Bar R. V(10)(B)(1), may not petition for reinstatement for two years from this order. Costs are taxed to respondent.

Judgment accordingly.

PFEIFER, LUNDBERG STRATTON, O'CONNOR, O'DONNELL, LANZINGER, and CUPP, JJ., concur.

BROWN, C.J., not participating.

_____

Cathleen M. Bolek and Christina M. Royer, for relator.

Bricker & Eckler, L.L.P., and Alvin E. Mathews Jr., for respondent.

_____