**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Disciplinary Counsel v. Becker*, **Slip Opinion No. 2014-Ohio-3665.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2014-OHIO-3665

DISCIPLINARY COUNSEL *v*. BECKER.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Disciplinary Counsel v. Becker*, Slip Opinion No. 2014-Ohio-3665.]**

*Attorneys—Misconduct—Misappropriation of funds entrusted to attorney as fiduciary of decedent's estate and as guardian of incompetent person— Disbarment.*

(No. 2013-1257—Submitted January 7, 2014—Decided September 3, 2014.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 2011-116.

_____

PFEIFER, J.

{¶ 1} Stephen Leslie Becker of Lima, Ohio, Attorney Registration No. 0002829, was admitted to the practice of law in Ohio on November 7, 1975. Relator, disciplinary counsel, filed a complaint against Becker on December 5, 2011, alleging that Becker had violated the Disciplinary Rules of the Code of

Professional Responsibility and the Rules of Professional Responsibility.[1] The complaint described a pattern of misconduct in which, over a period of years, Becker misappropriated funds entrusted to him, primarily to feed his gambling addiction.

**{¶ 2}** A panel of the Board of Commissioners on Grievances and Discipline held hearings on the matter in December 2012 and January 2013. The panel made findings of fact and conclusions of law and recommended that Becker be permanently disbarred. The board adopted the panel's report in its entirety.

**{¶ 3}** Both sides have filed objections in this court. Given the gravity and duration of the misconduct, the fiduciary duties violated, the harm caused to vulnerable victims, the multiple aggravating factors, and the sanctions imposed in similar cases, we adopt the board's findings of fact and conclusions of law. We also agree that permanent disbarment is the appropriate sanction.

**Misconduct**

*Count I—Christopher I. Becker Guardianships*

**{¶ 4}** Becker's nephew, Christopher I. Becker, was born in 1976 and suffers from severe developmental disabilities. On December 12, 1983, the Allen County Probate Court appointed Becker guardian of the estate of Christopher, then still a minor. Becker also prepared and filed a "Fiduciary's Acceptance" form, thereby subjecting himself to possible penalties for improper conversion of the property that he held as fiduciary.

**{¶ 5}** In November 1990, Becker lent $5,000 to Jack and Cindy Stevenson, taking a mortgage as security. In July 1991, Robyn Becker,

---

[1] Relator charged Becker with misconduct under the applicable Disciplinary Rules of the Code of Professional Responsibility for acts occurring before February 1, 2007, the effective date of the Rules of Professional Conduct, which superseded the Disciplinary Rules. Acts occurring thereafter were charged as violations of the Rules of Professional Conduct.

Becker's wife, lent an additional $56,000 to the Stevensons. This loan was also secured by a mortgage.

{¶ 6} In March 1992, Becker drafted a note for the Stevensons in which they agreed to repay a loan in the amount of $63,000. The note identified the lender as Christopher I. Becker. This loan was secured by a mortgage in favor of Christopher. The Stevensons used the proceeds of this loan to repay Becker and his wife for the two earlier loans. The loan was not disclosed on the guardian's account that Becker filed with the probate court. Two years later, when the Stevensons repaid the loan, the receipt of the check and the interest earned were not disclosed to the probate court.

{¶ 7} In September 1994, Christopher was no longer a minor but remained incompetent. Becker was again appointed guardian of Christopher's estate. Becker concedes that he failed to file the guardian's account as frequently as the law required and that he concealed his use of guardianship funds, including $32,152.50 he lent to himself to pay gambling debts. He conceded that this "loan" was not a proper use of Christopher's funds.

{¶ 8} In 2002, Becker used guardianship funds to lend $30,800 to his daughter to help her buy a house. A second mortgage was recorded in Becker's favor and not disclosed to the court. Becker conceded that it is not permissible to use guardianship funds to make a loan secured by a second mortgage.

{¶ 9} In January 2005, the guardianship was terminated because Christopher had moved to Colorado. Becker was ordered to transmit the guardianship funds to the Colorado guardian. The final account that Becker filed in April 2006 indicated that he had distributed in full the remaining balance of $35,082.75. But Becker admitted that he did not make that distribution. Instead, he issued a check to Christopher's father for $17,272.98 in November 2008. The final account also did not disclose the $30,800 loan to Becker's daughter.

**{¶ 10}** The board found by clear and convincing evidence that Becker's conduct regarding Christopher's guardianships violated DR 1-102(A)(3) (prohibiting conduct involving moral turpitude), 1-102(A)(4) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), 1-102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), and 1-102(A)(6) (prohibiting conduct that adversely reflects on the lawyer's fitness to practice law). We adopt the board's findings of fact and misconduct with respect to Count I.

*Count II—Eileen Binkley joint bank account*

**{¶ 11}** For over 20 years until her death in 2008, Becker helped care for his elderly aunt, Eileen Binkley. Binkley signed a will bequeathing one-third of her estate to Becker and a power of attorney granting Becker broad authority to manage her affairs. In July 2005, Becker opened a joint bank account in his and Binkley's name and deposited $20,500 in the account, including a check payable to Binkley for $18,000. Three more checks totaling $42,000 were deposited in August 2005—one payable to Binkley for $17,000 and two payable to Becker for $25,000. In July and August, Becker wrote checks to four different casinos totaling $37,000. From October to December 2005, Becker withdrew $9,500 in cash and wrote three more checks to casinos totaling $22,000 and a check for $25,000 to repay money that he had improperly taken from Christopher.

**{¶ 12}** In June 2007, Becker deposited a cashier's check in the amount of $15,000 drawn from a separate savings account of Binkley's. On the same day, Becker signed and endorsed a check for $15,000 payable to himself.

**{¶ 13}** In June 2008, Becker deposited $65,222.37 of Binkley's money into the joint account. Over the next ten days, Becker wrote checks totaling $62,500 to four casinos.

**{¶ 14}** Becker was confronted in October 2010 by attorneys from the firm that employed him, Huffman, Kelley, Becker & Brock, L.L.C. ("the Huffman

firm"). Becker admitted that he did not have authority to spend Binkley's money on his gambling debts. He acknowledged that he had stolen from her and referred to himself as a thief.

{¶ 15} The board found, by clear and convincing evidence, that Becker had used the joint account to convert tens of thousands of dollars belonging to his aunt. The board found that Becker's conduct violated DR 1-102(A)(3), 1-102(A)(4), and 102(A)(6) and Prof.Cond.R. 8.4(b) (prohibiting illegal acts that reflect adversely on the lawyer's honesty or trustworthiness), 8.4(c) (prohibiting conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(h) (prohibiting conduct that adversely reflects on the lawyer's fitness to practice law). We adopt the board's findings of fact and misconduct with respect to Count II.

*Count III—Eileen Binkley estate*

{¶ 16} Eileen Binkley, the subject of Count II of the complaint, died on August 1, 2008, at the age of 91. Her will was admitted to probate, and on August 6, 2008, Becker filed an application to be appointed executor. The application was granted, and Becker signed a fiduciary's acceptance form, thereby acknowledging that he was subject to penalties for improper conversion of property that he held as a fidiciary.

{¶ 17} Five days later, Becker issued a check payable to himself for $27,500 from the estate's bank account, calling it a "partial distribution" to a beneficiary, i.e., himself. No other distributions were made at that time. Over the next four months, Becker made other distributions to himself from the estate account totaling over $51,000.

{¶ 18} On January 21, 2009, Becker filed an estate inventory and a memorandum in which he purported to disclose all the property that Binkley had distributed as gifts before she died, including all money from joint bank accounts. Notably missing from the list, however, was any mention of the tens of thousands

of dollars that Becker had distributed to himself from the joint account from 2005 to 2008.  Even the existence of the joint account was not disclosed.  Becker used the joint account to hold estate funds, including a deposit in April 2009 of $96,979.50 from the proceeds of the sale of Binkley's house.  Over the next few months, Becker wrote several checks on the joint account, including $17,000 payable to casinos and $13,500 payable to cash.

{¶ 19} The "First and Final Fiduciary's Account" that Becker filed on January 21, 2010, contained intentionally false and misleading information and omissions.  For instance, Becker failed to disclose the checks written to the casinos and to cash.  The account also falsely stated that final distributions had been made to other beneficiaries in November 2009.  Those distributions were not made until May 2010 and October 2010, at least in part because the needed funds were unavailable.  When asked at the disciplinary hearing why the funds were not available, Becker stated, "Because I had gambled the money away."

{¶ 20} The board found by clear and convincing evidence that Becker's conduct regarding Binkley's estate violated Prof.Cond.R. 8.4(b), 8.4(c), 8.4(d) (prohibiting conduct that is prejudicial to the administration of justice), and 8.4(h).  We adopt the board's findings of fact and misconduct with respect to Count III.

*Count IV—Funds pertaining to other clients*

{¶ 21} The parties stipulated at the hearing that in April 2010, Becker improperly used for his personal purposes $2,216 that had been given him as payment for legal services and that should have been reported to and deposited with the Huffman firm.  Becker falsely assured his colleagues that this was a one-time mistake.  Becker received a settlement check for $24,920.48 for client John Festa, which should have been deposited into the firm's IOLTA account.  Instead, he deposited the check into an account that he controlled.  Becker wrote a check for $22,040.61 from the account to pay his brother John Becker his share of

Binkley's estate. Becker also wrote a check for $2,879.87 payable to himself. When Becker subsequently paid Festa $16,815.36, he used attorney fees received from a different client. The board concluded by clear and convincing evidence that Becker violated Prof.Cond.R. 8.4(c), 8.4(h), and 1.15(a) (a lawyer shall hold the property of clients in the lawyer's possession in an IOLTA account).

{¶ 22} Several times Becker received funds for attorney fees that he did not report to the Huffman firm—$6,230.12 from Festa, $1,200 from Matt Gossard, $5,000 from Michael Steinke, $2,000 from Joan Clellan, $1,500 from Brad Longstreth, $650 from Dennis Gardner, and an unidentified amount from Jessica Wheeler. The board found by clear and convincing evidence that this dishonesty to his employer in attempting to conceal his diversion of those fees violated Prof.Cond.R. 8.4(c) and 8.4(h).

{¶ 23} We adopt the board's findings of fact and misconduct with respect to Count IV.

**Sanction**

{¶ 24} "When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B). *Disciplinary Counsel v. Broeren*, 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21." *Disciplinary Counsel v. O'Malley*, 137 Ohio St.3d 161, 2013-Ohio-4566, 998 N.E.2d 470, ¶ 15.

{¶ 25} The board found several aggravating factors: that Becker acted with a dishonest and selfish motive, engaged in a pattern of misconduct, committed multiple offenses, caused harm to vulnerable victims, and failed to make full restitution. BCGD Proc.Reg. 10(B)(1)(b), (c), (d), (h), and (i). The

board found one mitigating factor: that Becker had no prior disciplinary record. BCGD Proc.Reg. 10(B)(2)(a).

{¶ 26} Becker offered no reliable evidence that he suffered from a mental disability or a chemical dependency when the violation occurred. Accordingly, we presume that he was healthy and unhindered at those times. *Disciplinary Counsel v. McCord*, 121 Ohio St.3d 497, 2009-Ohio-1517, 905 N.E.2d 1182, ¶ 5.

{¶ 27} It is obvious, given how much of the converted and misappropriated money went to pay casinos, that Becker has a gambling problem. But Becker has not established all the elements necessary to establish this condition as a mitigating factor under BCGD Proc.Reg. 10(B)(2)(g). His former psychologist did testify that Becker was a pathological gambler, but he did not testify that this disorder caused Becker's misconduct, BCGD Proc.Reg. 10(B)(2)(g)(ii), or that Becker had undergone a sustained period of successful treatment, BCGD Proc.Reg. 10(B)(2)(g)(iii). *See Stark Cty. Bar Assn. v. Williams,* 137 Ohio St.3d 112, 2013-Ohio-4006, 998 N.E.2d 427, ¶ 23. Becker's failure to pursue any kind of consistent help for his problem eliminates this factor as possible mitigation.

{¶ 28} Becker asserted that he was cooperative and that his cooperativeness should be a mitigating factor. BCGD Proc.Reg. 10(B)(2)(d). Relator contended that Becker was uncooperative and that his uncooperativeness should be an aggravating factor. BCGD Proc.Reg. 10(B)(1)(e). There is nothing in the record that indicates that Becker was either notably cooperative or conspicuously uncooperative.

{¶ 29} Becker claims in his objections to the board's report that he has accepted full responsibility for his actions and that his acceptance should be a mitigating factor. We see nothing in the record that suggests that Becker has accepted full responsibility for his conduct. Becker characterized some of his misappropriations as "loans" and suggests that calling some of his

misappropriations "theft" is a matter of semantics. Becker also tried to take credit for self-reporting even though the record reflects that the self-reporting occurred only after he had been confronted by his colleagues at the Huffman firm. *See Disciplinary Counsel v. Yajko*, 77 Ohio St.3d 385, 388, 674 N.E.2d 684 (1997).

{¶ 30} Becker also objects to the board's recommendation of disbarment, citing his otherwise excellent record and his alleged attempts to address his addiction. But we have consistently stated that "the primary purpose of the disciplinary process is not to punish the offender but to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship." *Cleveland Metro. Bar Assn. v. Lockshin*, 125 Ohio St.3d 529, 2010-Ohio-2207, 929 N.E.2d 1028, ¶ 42. In this case, it is obvious that an extreme sanction is necessary to protect the public. Becker misappropriated substantial sums that were entrusted to him. As we have stated, "No circumstances ever justify the deliberate misappropriation of [a] client's funds for a lawyer's personal benefit," and "the appropriate discipline when a lawyer knowingly converts client funds is disbarment." *Cleveland Bar Assn. v. Belock*, 82 Ohio St.3d 98, 100, 694 N.E.2d 897 (1998); *Cuyahoga Cty. Bar Assn. v. Churilla*, 78 Ohio St.3d 348, 350, 678 N.E.2d 515 (1997). Given the extent and duration of the various misappropriations and the helplessness of some of the victims (including a disabled nephew and an elderly aunt), we are confident that disbarment is the appropriate sanction.

{¶ 31} Though gambling was a primary factor in many of the misappropriations, it is not clear that it was the only factor. Furthermore, there is no reason to believe that Becker has conquered his gambling problems. He has not sought regular treatment for his gambling problems. In fact, it appears that he has not sought any treatment since 2012. This case is therefore unlike *Akron Bar Assn. v. Smithern*, 125 Ohio St.3d 72, 2010-Ohio-652, 926 N.E.2d 274. In *Smithern,* the respondent acknowledged her addictions, was receiving treatment

for them, and demonstrated that she could overcome them with continued treatment. *Id.* at ¶ 10. There is no reason to think that Becker has control over his gambling problem.

**{¶ 32}** After considering the violations committed, the aggravating factors, the mitigating factor, and all other relevant information, we conclude that the appropriate sanction is disbarment. Accordingly, Stephen Leslie Becker is hereby permanently disbarred from the practice of law in Ohio. Costs are taxed to Becker.

Judgment accordingly.

O'CONNOR, C.J., and O'DONNELL, LANZINGER, KENNEDY, FRENCH, and O'NEILL, JJ., concur.

_____

Scott J. Drexel, Disciplinary Counsel, Joseph M. Caligiuri, Chief Assistant Disciplinary Counsel, and Robert R. Berger and Karen H. Osmond, Assistant Disciplinary Counsel, for relator.

Robert K. Leonard Law Offices, L.L.C., and Robert K. Leonard, for respondent.

_____