**DISCIPLINARY COUNSEL *v.* TALIKKA**.

[Cite as *Disciplinary Counsel v. Talikka,* **135 Ohio St.3d 323, 2013-Ohio-1012.**]

*Attorneys—Misconduct—Multiple violations involving multiple clients—Failure to return unearned fees—Failure to keep clients informed of status of case—Failure to keep client funds in separate account—Conduct adversely reflecting on fitness to practice law—Two-year suspension, second year stayed on conditions.*

(No. 2012-1324—Submitted January 8, 2013—Decided March 20, 2013.)

ON CERTIFIED REPORT by the Board of Commissioners on Grievances and Discipline of the Supreme Court, No. 11-009.

_____

**Per Curiam**.

{¶ 1} Respondent, Leo Johnny Talikka of Painesville, Ohio, Attorney Registration No. 0006613, was admitted to the practice of law in Ohio in 1968. In a third amended complaint filed on July 18, 2012, relator, disciplinary counsel, charged Talikka with professional misconduct in his handling of eight separate client matters.

{¶ 2} The parties entered into stipulations of fact and misconduct with respect to all eight counts, acknowledging that Talikka had committed multiple violations of 12 Rules of Professional Conduct—38 violations in all. They stipulated to 62 exhibits, four aggravating factors, and two mitigating factors, and agreed that the appropriate sanction for Talikka's misconduct is a two-year suspension from the practice of law in Ohio with the second year stayed on conditions. They also jointly waived a hearing on the matter.

{¶ 3} A panel of the Board of Commissioners on Grievances and Discipline adopted the parties' stipulations of fact and misconduct and

aggravating and mitigating factors. The panel found one additional aggravating factor, but agreed that a two-year suspension with one year stayed on conditions was the appropriate sanction for Talikka's misconduct.

{¶ 4} The board adopted the panel's findings of fact and misconduct, as well as its findings regarding the aggravating and mitigating factors present in this case. However, citing the extensive nature of the misconduct and the harm caused to the eight affected clients, the board recommended that Talikka be indefinitely suspended from the practice of law and that reinstatement be conditioned on the payment of restitution and interest to three of the affected clients.

{¶ 5} Talikka objects to the board's recommended sanction, and the relator concurs in that objection. Because we believe that the sanction recommended by the parties and the panel will adequately protect the public from future harm, we sustain Talikka's objection and suspend him from the practice of law for two years, with the second year stayed on the conditions recommended by the panel.

**Misconduct**

{¶ 6} The parties have stipulated that Talikka committed three violations of Prof.Cond.R. 1.3 (requiring a lawyer to act with reasonable diligence in representing a client) in his handling of three separate client matters by failing to file an appellate brief on behalf of one client, failing to respond to a motion to dismiss and a motion for judgment on the pleadings in a second client's case, and failing to file a motion for judicial release for a third client. He failed to inform two of those clients that their cases had been dismissed, thereby violating Prof.Cond.R. 1.4(a)(3) (requiring a lawyer to keep the client reasonably informed about the status of a matter), and failed to refund the unearned portion of their retainers when they terminated his representation, in violation of Prof.Cond.R. 1.16(e) (requiring a lawyer to promptly refund any unearned fee upon the

lawyer's withdrawal from employment). He also failed to respond to reasonable requests for information from his client in one matter in violation of Prof.Cond.R. 1.4(a)(4).

{¶ 7} Talikka also engaged in misconduct related to the handling of client funds. He failed to safeguard $10,000 belonging to a client in his client trust account, in violation of Prof.Cond.R. 1.15(a) (requiring a lawyer to hold property of clients in an interest-bearing client trust account, separate from the lawyer's own property). He failed to maintain records of the funds he should have been holding in his client trust account for five separate clients, in violation of Prof.Cond.R. 1.15(a)(2) (requiring a lawyer to maintain a record for each client on whose behalf funds are held) and failed to properly administer those funds, in violation of Prof.Cond.R. 1.15(a)(5) (requiring a lawyer to perform and retain a monthly reconciliation the funds held in the lawyer's client trust account).

{¶ 8} And in three personal-injury matters for which Talikka was to receive a contingency fee, he failed to have his clients sign closing statements, in violation of Prof.Cond.R. 1.5(c)(2) (requiring a lawyer entitled to a contingency fee to prepare a closing statement to be signed by the lawyer and the client, detailing the lawyer's compensation, any costs and expenses to be deducted, and any division of fees with a lawyer not in the same firm), and failed to promptly distribute all of the funds that his clients were entitled to receive, in violation of Prof.Cond.R. 1.15(d) (requiring a lawyer to promptly deliver funds or other property that the client is entitled to receive).

{¶ 9} Talikka stipulates that his conduct in five of the charged matters violated Prof.Cond.R. 8.4(c) (prohibiting a lawyer from engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) and that his conduct with respect to one of those clients violated Prof.Cond.R. 8.4(d) (prohibiting a lawyer from engaging in conduct that is prejudicial to the administration of justice). He also acknowledges that his conduct in all eight of the charged counts

violated Prof.Cond.R. 8.4(h) (prohibiting a lawyer from engaging in conduct that adversely reflects on the lawyer's fitness to practice law).

**{¶ 10}** On the recommendation of the panel and board, we adopt the parties' stipulated findings of fact and misconduct.

## Sanction

**{¶ 11}** When imposing sanctions for attorney misconduct, we consider relevant factors, including the ethical duties that the lawyer violated and the sanctions imposed in similar cases. *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, ¶ 16. In making a final determination, we also weigh evidence of the aggravating and mitigating factors listed in BCGD Proc.Reg. 10(B). *Disciplinary Counsel v. Broeren,* 115 Ohio St.3d 473, 2007-Ohio-5251, 875 N.E.2d 935, ¶ 21.

**{¶ 12}** Here, Talikka has engaged in a pattern of misconduct in violation of the Rules of Professional Conduct, as outlined above.

**{¶ 13}** As aggravating factors, the parties stipulated and the board found that Talikka acted with a dishonest or selfish motive, engaged in a pattern of misconduct, committed multiple offenses, and failed to make restitution to the clients harmed by his misconduct.[1] *See* BCGD Proc.Reg. 10(B)(1)(b), (c), (d), and (i). The panel and board also found that Talikka's conduct harmed a number of vulnerable clients. *See* BCGD Proc.Reg. 10(B)(1)(h).

**{¶ 14}** As mitigating factors, the parties stipulated that Talikka had no prior disciplinary record in a career spanning more than 40 years and that he demonstrated good character apart from the charged misconduct, evidenced by letters from Judges Thomas D. Lambros, Ronald W. Vettel, Michael A. Cicconetti, Charles G. Hague, and Alfred W. Mackey.

---

1. At oral argument, the parties stated that following the board's issuance of its report, Talikka made restitution to the affected clients, but that he had not paid them interest for the time that he held their funds.

{¶ 15} The parties have stipulated that the appropriate sanction for Talikka's misconduct is a two-year suspension from the practice of law, with the second year stayed on the conditions that he (1) commit no further misconduct, (2) make restitution of $8,674.59 to Jeffrey Homkes, $1,000 to Fran Cantrell, and $39,196.70 to John Ingram, and (3) complete one year of monitored probation in accordance with Gov.Bar R. V(9)(B) upon his reinstatement to the practice of law. The panel adopted the parties' stipulated sanction and further specified that regardless of whether the term of the suspension had passed, Talikka should not be reinstated to the practice of law until he makes the stipulated restitution, *plus interest at the statutory rate* calculated from various specified dates to the date of payment to Jeffrey Homkes, Fran Cantrell, and John Ingram. However, noting the extensive nature of Talikka's misconduct, which caused harm to eight separate clients, the board recommended that he be indefinitely suspended from the practice of law and that his reinstatement be conditioned on the payment of restitution plus interest to the affected clients as recommended by the panel.

{¶ 16} Talikka objects to the board's recommended sanction, arguing that it is too harsh in light of his long and distinguished career prior to the charged misconduct, his excellent character and reputation as attested to by five judges, his voluntary involvement with the Ohio Lawyers Assistance Program, and the sanctions this court has imposed in other cases for comparable misconduct. Relator joins Talikka in urging this court to reject the board's recommendation and adopt their stipulated sanction. In support of their argument, Talikka and relator argue that Talikka's misconduct is comparable to that of the attorney in *Disciplinary Counsel v. Folwell*, 129 Ohio St.3d 297, 2011-Ohio-3181, 951 N.E.2d 775, and that Talikka's misconduct warrants the same sanction. In *Folwell,* we imposed a two-year suspension with the second year stayed on the conditions that the attorney commit no further misconduct and submit to a one-year period of monitored probation.

**{¶ 17}** Folwell, an attorney with approximately 20 years of experience, stipulated that he had engaged in a pattern of misconduct involving seven separate client matters and that his conduct adversely reflected on his fitness to practice law. He failed to provide competent representation and failed to act with reasonable diligence by settling a case for a minor client without obtaining probate court approval, failed to maintain separate client ledgers for his client trust account, failed to perform monthly reconciliations of that account, and improperly used client funds. He also unreasonably delayed performing contracted work for one client, led a client to believe that his case had been filed when it had not, accepted retainers from other clients, failed to perform the contracted work, and delayed for as long as two and a half years before refunding the unearned portion of his fees. As mitigating factors, the parties stipulated that Folwell had no prior disciplinary record and had cooperated in the disciplinary proceedings. *See* BCGD Proc.Reg. 10(B)(2)(a) and (d).

**{¶ 18}** Citing *Disciplinary Counsel v. Claflin*, 107 Ohio St.3d 31, 2005-Ohio-5827, 836 N.E.2d 564, at ¶ 14-15, we recognized that disbarment is the presumptive sanction for misappropriation, but acknowledged that that sanction can be tempered by mitigating factors. *Folwell* at ¶ 36. Although we found that Folwell had engaged in a pattern of misconduct involving multiple offenses and that he acted with a dishonest or selfish motive, *see* BCGD Proc.Reg. 10(B)(1)(d) and (b), we adopted the parties' recommended sanction of a two-year suspension with the second year stayed on the conditions that Folwell commit no further misconduct and complete a one-year period of monitored probation.

**{¶ 19}** We have long recognized that the primary purpose of the disciplinary process is not to punish the offender but to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship. *See, e.g., Disciplinary Counsel v. Agopian*, 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368, ¶ 10.

**{¶ 20}** Here, Talikka has no prior disciplinary record in his 40-plus years of practice and suffered from a series of serious health problems during the time that he committed his misconduct. He voluntarily participated in a psychological evaluation conducted by Robert Kaplan, Ph.D., who reports that Talikka does not suffer from any mental-health or substance-abuse disorder, but that he is a proud man who took on more work than he could handle to maintain his self-esteem as he faced those significant health problems. Additionally, Dr. Kaplan reports that Talikka has accepted full responsibility for his conduct. In light of Talikka's decision to stipulate to the facts underlying relator's complaint as well as the charged misconduct, we agree.

**{¶ 21}** Dr. Kaplan further states that through ongoing counseling, Talikka has come to understand and accept the limitations that his age- and health-related issues impose on his work. Talikka has presented letters from five judges who have known him both personally and professionally for some time. Each of them attests to his honesty, good character, professionalism, zealous representation of his clients, and good reputation in the legal community. And although Talikka has caused harm to vulnerable clients, he has made restitution to those clients affected by his misconduct and pledged to pay interest on the funds that he wrongfully held as soon as he is presented with a calculation of the amounts due and owing. For these reasons, we agree that the sanction recommended by the parties and the panel is adequate to protect the public from future harm.

**{¶ 22}** Accordingly, we suspend Leo Johnny Talikka from the practice of law in Ohio for two years with the second year stayed on the conditions that he (1) commit no further misconduct, (2) pay statutory interest within 30 days of the date of this order to the following clients at the rate prescribed by R.C. 1343.03(A) and 5703.47 on the following principal amounts for the specified periods of time: (a) $8,674.59 from May 6, 2009, to the date restitution was made to Jeffrey Homkes, (b) $1,000 from July 15, 2011, to the date restitution was

made to Fran Cantrell, and (c) $39,196.70 from November 30, 2011, to the date restitution was made to John Ingram, and (3) upon reinstatement serve a one-year period of monitored probation in accordance with Gov.Bar R. V(9)(B). If Talikka fails to comply with the conditions of the stay, the stay will be lifted and he will serve the full two-year suspension. Costs are taxed to Talikka.

Judgment accordingly.

PFEIFER, O'DONNELL, KENNEDY, and O'NEILL, JJ., concur.

O'CONNOR, C.J., and LANZINGER and FRENCH, JJ., dissent.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 23} I dissent from the majority's decision to sustain the parties' objection to the recommended sanction of the Board of Commissioners on Grievances and Discipline and to adopt the parties' stipulated findings of fact and misconduct. I conclude that the majority's decision that Talikka should be suspended from the practice of law in Ohio for two years with the second year stayed on the conditions that he (1) commit no further misconduct and (2) pay statutory interest rates prescribed by R.C. 1343.03(A) and 5703.47 to the clients who were victims of his misconduct[2] is wholly inadequate when a thorough review of the record is made.

{¶ 24} Given the nature of Talikka's misconduct, which affected several vulnerable victims, and his failures to refund an unearned portion of his clients' retainers when they terminated his representation, to safeguard $10,000 belonging to a client in his client trust account, and to promptly distribute all of the funds

---

2. The majority opinion provides that within 30 days of the date of this order, Talikka shall pay statutory interest rates to Jeffrey Homkes, on principal of $8,674.59, from May 6, 2009, to the date restitution is made; to Fran Cantrell, on principal of $1,000, from July 15, 2011, to the date restitution is made; and to John Ingram, on principal of $39,196.70, from November 30, 2011, to the date restitution is made.

that his clients were entitled to receive, the board's recommendation of an indefinite suspension properly reflects our obligation to protect the public.

### The nature of the misconduct

{¶ 25} The majority omits the details of Talikka's misconduct because the parties stipulated to the facts and misconduct in this case. But a review of the misconduct is essential and I believe will underscore the inadequacy of the majority's decision. Indeed, given the significant number of violations and the deleterious effect Talikka's misconduct caused to eight vulnerable clients, a more severe sanction than that imposed by the majority is warranted. Thus, Talikka's misconduct must be considered more fully.

### Count One—Michelle Topazio

{¶ 26} Michelle Topazio hired Talikka on June 4, 2008, to appeal a May 13, 2008 judgment entry in which the Cuyahoga County Juvenile Court awarded custody of her minor children to their biological father. On June 5, 2008, Topazio gave Talikka a $15,000 flat fee by credit-card payment. Talikka deposited the funds into his First Merit business operating account, but did not give Topazio a written fee agreement.

{¶ 27} On June 16, 2008, Talikka filed a notice of appeal on Topazio's behalf with the Eighth District, but he never filed an appellate brief as required by the Ohio Rules of Appellate Procedure. On September 29, 2008, the appellate court, sua sponte, dismissed Topazio's appeal due to Talikka's failure to prosecute the appeal. Despite the gravity of the case, Talikka did not advise Topazio that her appeal had been dismissed.

{¶ 28} On October 15, 2008, Topazio terminated Talikka's representation and requested a refund of the unused portion of the retainer. Two days later, Topazio sent Talikka an e-mail requesting that he refund her $13,500 in unearned fees. Talikka did not send Topazio a bill for his legal services. Instead, he

determined that after expenses, he owed Topazio only $10,000 in unearned fees. Despite that determination, Talikka did not return any of the funds to Topazio.

{¶ 29} On March 6, 2009, after learning that Talikka possessed Topazio's funds, the guardian ad litem ("GAL") in the underlying juvenile court case moved for garnishment in the Lake County Court of Common Pleas to force Talikka to release the funds for unpaid GAL fees. On April 17, 2009, the trial court filed an entry ordering Talikka to immediately deposit Topazio's $10,000 with the clerk of courts. On May 15, 2009, Talikka deposited the $10,000 using a check drawn on his First Merit IOLTA account. However, Topazio's funds were not in Talikka's First Merit IOLTA account. The funds in the First Merit IOLTA account belonged to other clients.

{¶ 30} On June 25, 2009, Topazio filed a grievance against Talikka for his failure to file a brief in her appeal, communicate with her about the case, or refund the remainder of her retainer. Topazio averred that after months of trying to contact Talikka, Talikka finally contacted her new counsel, R. Russell Kubyn, on June 3, 2009. Talikka informed Kubyn that he had no response to Topazio's questions and that he would respond only if he was sued.

*Count Two—Jeffrey Homkes*

{¶ 31} In 2008, Jeffrey Homkes hired Talikka to represent him in a personal-injury case through a one-third contingency-fee agreement. In April 2009, Talikka settled Homkes's claim for $33,000.

{¶ 32} On April 16, 2009, Talikka's First Merit IOLTA account balance was $792.66. On April 28, 2009, Talikka deposited a $1,500 retainer from Esther Nash into his First Merit IOLTA account, thereby increasing the account balance to $2,292.66. Talikka deposited Homkes's $33,000 settlement check into his First Merit IOLTA account on April 30, 2009, thereby increasing the account balance to $35,292.66. On May 1, 2009, Talikka disbursed $1,225.25 to a person named

Michael Yates, reducing the First Merit IOLTA balance to $34,067.41. At that time, none of the funds in Talikka's IOLTA account belonged to Yates.

{¶ 33} On May 6, 2009, Talikka disbursed $11,325.41 to Homkes. And on May 7, 2009, Talikka withdrew his one-third fee of $11,000 from Homkes's settlement funds, leaving the balance at $11,742.41, $10,674.59 of which belonged to Homkes. Talikka did not have Homkes sign a closing statement.

{¶ 34} From May 8, 2009, to May 15, 2009, Talikka made a number of other deposits and withdrawals from his First Merit IOLTA account that were unrelated to the Homkes case. After those transactions were complete, the IOLTA account balance was $17,800.50. On May 15, 2009, Talikka wrote a check for $10,000 from the IOLTA account to the clerk of courts on Topazio's behalf, leaving a $7,800.50 balance. As a result, in addition to failing to timely distribute all of the settlement funds to Homkes, Talikka also used at least $2,874.09 of the $10,674.59 belonging to Homkes to satisfy the Lake County court order in Topazio's case.

{¶ 35} On May 18, 2009, Talikka continued to misuse Homkes's funds by writing an IOLTA check for $5,500 to himself, thereby reducing the First Merit IOLTA account balance to $2,300.50.

{¶ 36} On January 8, 2010, Talikka closed his First Merit IOLTA account and transferred $9,478.89 to his Northwest Savings Bank IOLTA account. On January 12, 2010, Talikka disbursed $2,000 from his Northwest IOLTA account to AR Systems on Homkes's behalf, which reduced the amount he owed Homkes to $8,674.59.

{¶ 37} But Talikka never disbursed the remaining $8,674.59 to his client. And since February 1, 2007, he has neither maintained a client ledger of Homkes's funds contained in his IOLTA accounts, nor has he reconciled his IOLTA account on a monthly basis.

*Count Three—Theresa Waclawski*

**{¶ 38}** In June 2008, Theresa Waclawski hired Talikka on a contingency-fee basis to handle her personal-injury claim against Cheryl Lefelhoc.

**{¶ 39}** On November 28, 2008, Talikka filed a civil lawsuit on Waclawski's behalf against Lefelhoc in the Lake County Court of Common Pleas. On October 14, 2009, despite the fact that Waclawski had not yet paid him anything, Talikka disbursed $1,200 from his First Merit IOLTA account to Great Lakes Pain Management on Waclawski's behalf.

**{¶ 40}** A few weeks later, Talikka settled the case for $70,000. A $70,000 settlement check was issued to Talikka and made payable to him and Waclawski.

**{¶ 41}** As of November 8, 2009, Talikka's First Merit IOLTA account balance was $199.31. The next day, Talikka deposited Waclawski's settlement check into his First Merit IOLTA account, thereby increasing the IOLTA account balance to $70,199.31. On November 18, 2009, Talikka made two disbursements on Waclawski's behalf from his First Merit IOLTA account: $23,331.33 to Waclawski and $23,331.33 to himself for attorney fees. Talikka never had Waclawski sign a closing statement for the $70,000 settlement.

**{¶ 42}** Talikka did not deposit any of Waclawski's funds into his Northwest IOLTA account, but in December 2009, Talikka used funds from his Northwest IOLTA account to make multiple disbursements, totaling several thousand dollars, on Waclawski's behalf: $365 to Litigation Management; $257.25 to Susan Goodell & Associates; $276.90 to Parise & Associates; $2,068.36 to Mentor Way Nursing; and $861.48 to Renillo Record Services.

**{¶ 43}** By December 28, 2009, Talikka had disbursed $51,696.40[3] of the $70,000, retaining $18,303.60 belonging to Waclawski in Talikka's possession.

---

3. On June 29, 2009, Talikka disbursed $4.75 to the Willoughby Municipal Court from his business checking account on Waclawski's behalf.

**{¶ 44}** Between November 19, 2009, and January 8, 2010, Talikka's First Merit IOLTA account balance dropped to $9,478.89, indicating that Talikka had misappropriated at least $8,824.71 of Waclawski's settlement funds during that period. On January 8, 2010, Talikka closed his First Merit IOLTA account and transferred the remaining $9,478.89 to his Northwest IOLTA account.

**{¶ 45}** On April 27, 2010, Waclawski filed a grievance with relator seeking the remainder of her settlement proceeds from Talikka. In her grievance, Waclawski alleged that Talikka not only wrongly held her money, but that he was unprofessional and "constantly used foul language towards" her. As one example, she described an incident in which Talikka took her and her daughter into a stairwell at the courthouse to discuss a settlement offer from the insurance company. When Waclawski rejected the offer, Talikka became irate, swore at her, and told her she was "stupid." When Talikka later returned to the stairwell with the insurance company's higher offer, Waclawski rejected it. She alleged that at that point Talikka lunged at her with his teeth clenched and she feared for her life because she thought he was going to shove her down the stairs.

**{¶ 46}** Waclawski alleged that when Talikka returned with a third offer, which Waclawski felt was still low, Talikka told Waclawski and her daughter that he would not take any fees from the $10,000 the insurance company had paid earlier and that she would have to pay only 5 to 10 percent of her medical bills. Waclawski ultimately accepted the offer, but she felt that Talikka had coerced her into it.

**{¶ 47}** Waclawski also alleged in her grievance that a few days later, one of Talikka's staff members arrived at her home with the insurance check for her signature but no settlement statement. Waclawski refused to sign anything without a breakdown of the expenses. The staff member left; Talikka then called Waclawski and told her to sign the check so that he could get it to the bank by the end of the day. She did so, again feeling coerced, without a settlement statement.

{¶ 48} On April 28, 2010, the day after Waclawski filed the grievance, Talikka disbursed an additional $7,910.01 to her from his Northwest IOLTA account, leaving an outstanding balance of $10,393.59, all of which belonged to Waclawski. On June 22, 2010, Talikka disbursed $10,425.92 to the Ohio Department of Job and Family Services ("ODJFS") on Waclawski's behalf from his Northwest IOLTA account. Because by that time Talikka had only $1,568.88 of Waclawski's funds remaining in his Northwest IOLTA account, Talikka used $8,857.04 of other client funds in that account to cover the payment to ODJFS. In other words, Talikka misused other clients' funds to repay the funds belonging to Waclawski because he had used her funds for other purposes.

{¶ 49} Since February 1, 2007, Talikka has neither maintained a client ledger of Waclawski's funds contained in his IOLTA accounts, nor reconciled his IOLTA account on a monthly basis.

*Count Four—Dana Kooyman*

{¶ 50} Early in 2008, Dana Kooyman contacted Talikka to represent her in a divorce action. Talikka told Kooyman that he would charge an hourly rate for the representation and requested a $2,000 retainer. Kooyman paid Talikka the $2,000 retainer in cash but Talikka did not give her a receipt for the payment. Kooyman neither signed nor received a written fee agreement.

{¶ 51} On May 6, 2008, Talikka filed a complaint for divorce on Kooyman's behalf in the Lake County Court of Common Pleas. During the representation, Kooyman paid Talikka an additional $2,000 in cash and Talikka again failed to give her a receipt for the payment. In her grievance, Kooyman alleged that she gave Talikka another $1,500 and was again given no receipt.

{¶ 52} At the conclusion of the divorce proceedings, the court awarded Kooyman one-half of her ex-husband's 401K account. Shortly after July 9, 2009, Talikka received a $25,045.83 check made payable to Kooyman that represented half the proceeds of the 401K account. On July 13, 2009, Talikka's First Merit

IOLTA account balance was $1,011.06. The following day, Talikka deposited Kooyman's check into his First Merit IOLTA account, thereby increasing the IOLTA account balance to $26,056.89.

{¶ 53} On July 15, 2009, Talikka withdrew $1,100 from his First Merit IOLTA account for a disbursement unrelated to Kooyman's case, thereby reducing that IOLTA account balance to $24,956.89. On July 17, 2009, Talikka withdrew $14,500 from his First Merit IOLTA account for attorney fees in Kooyman's case. That same day, Talikka deposited $3,000 into his First Merit IOLTA account, thereby increasing the IOLTA balance to $13,456.89, of which $11,556.89 belonged to Kooyman.

{¶ 54} Between July 17, 2009, and July 23, 2009, Talikka made multiple deposits to and disbursements from the First Merit IOLTA account: a $2,500 deposit from Ralph Smith; a $260 disbursement to the Geauga County Clerk of Courts for filing fees; a $1,846.25 deposit from Richard Hennig Co., L.P.A.; a $771.08 disbursement to Kobria; and a $6,000 deposit of a settlement check for Debra and Eugene Daugherty. These transactions left a $22,772.06 balance in the First Merit IOLTA account on July 23, 2009.

{¶ 55} Kooyman went to Talikka's office two or three times before receiving her settlement proceeds. Finally, despite having only $11,556.89 belonging to Kooyman in his First Merit IOLTA account, Talikka disbursed $16,053.85 to Kooyman, an overpayment of $4,496.96. Talikka did not have $4,496.96 of personal funds in his First Merit IOLTA account when he paid Kooyman on July 23, 2009. Rather, Talikka again misappropriated other clients' funds to pay what he believed he owed Kooyman.

{¶ 56} Talikka has failed to account for the other client funds he used to overpay Kooyman. And since February 1, 2007, he has neither maintained a client ledger of Kooyman's funds contained in his IOLTA accounts, nor reconciled his IOLTA account on a monthly basis.

*Count Five—Timothy Price*

{¶ 57} On April 6, 2009, Timothy Price hired Talikka to represent him in an employment case in which Price alleged several federal and state-law claims against Price's employer, Avery Dennison, and its insurer, Aetna. Price signed a one-third contingent-fee agreement with Talikka at the time of retention.

{¶ 58} On December 21, 2009, Talikka filed suit on Price's behalf against Avery and Aetna in the Lake County Court of Common Pleas. On February 1, 2010, Avery and Aetna removed the case to the United States District Court for the Northern District of Ohio. During the pendency of the federal case, Talikka was Price's counsel of record. At no time did Talikka move to withdraw as counsel.

{¶ 59} On March 19, 2010, Avery and Aetna filed a motion to dismiss. Talikka did not file an opposition. Consequently, on April 29, 2010, the federal court dismissed all of Price's claims against Avery and all of his state-law claims against Aetna.

{¶ 60} On June 28, 2010, Aetna moved for judgment on the pleadings on the remaining claims. Talikka again failed to file a response. Not surprisingly, the federal court then dismissed the remaining claims against Aetna and ended the suit. Talikka did not notify Price about the dismissal. Price first learned about the dismissal in July 2011 when he contacted an attorney from another law firm.

{¶ 61} On August 3, 2011, Price filed a grievance with the Lake County Bar Association. He stated that Talikka did not keep him informed about the status of his case and that he spent months trying to reach Talikka to no avail.

{¶ 62} On September 19, 2011, Price filed a complaint against Talikka for malpractice.

{¶ 63} Subsequently, Price wrote a letter to the Lake County Bar Association in which he stated that during the pretrial hearing on his malpractice action, he "had an opportunity with [his] attorney present, to listen to Judge

16

Joseph Gibson" who "look[ed] at all angles of the case." After the hearing, Price "had a different outlook regarding the case" against Aetna, meaning that he felt that "even if Mr. Talikka had responded [to the motion for summary judgment], it would not have made a difference in the decision of the court." However, Price stated that he "was upset because * * * Talikka never told [him] what happened." Price and Talikka settled the matter, and Price dismissed the case with prejudice.

*Count Six—Fran Cantrell*

{¶ 64} Fran Cantrell's daughter, Florence Rowles, is incarcerated at the Ohio Reformatory for Women. On October 15, 2009, Cantrell retained Talikka to assist her in securing either judicial release for Rowles or her transfer to a prison closer to Cantrell's residence. Cantrell paid Talikka a $1,500 flat fee to perform both services. By July 2011, approximately eight months after Cantrell hired Talikka, he still had not filed the motion for judicial release or other pleading on behalf of Cantrell and Rowles.

{¶ 65} Cantrell discharged Talikka and hired attorney David Patterson, who filed the motion for judicial release on July 15, 2011. Later that month, attorney Patterson asked Talikka for a refund for Cantrell. On July 25, 2011, Talikka sent Cantrell and attorney Patterson an invoice indicating that Talikka had provided 8.2 hours of legal services and that no refund was due, despite his failure to file a single pleading or complete his representation.

{¶ 66} On July 21, 2011, Cantrell filed a grievance with relator in which she alleged that she had waited three years for Talikka to get her daughter out of jail, but nothing happened. Attorney Patterson had promptly contacted Rowles's social worker about judicial release, and when he did so, he learned that Talikka had never contacted her about Rowles's early release, but that someone had contacted her in an effort to get Rowles transferred to Cleveland to be closer to her family. Talikka failed to refund the unearned portion of his flat fee to Cantrell and has never done so.

*Count Seven—Diana Montagino*

**{¶ 67}** Diana Montagino was assaulted on May 2, 2008, at work at Perry Middle School by a student who put ink in her coffee. More than a year later on May 21, 2009, Montagino retained Talikka on a contingency-fee basis to handle the related personal-injury case. Talikka mistakenly assured Montagino that the statute of limitations was two years and indicated that he would file the complaint before May 2010.

**{¶ 68}** On April 30, 2010, Talikka filed a complaint on Montagino's behalf against the student, the student's parents, the school, and the board of education. On July 9, 2010, the school and the board of education moved for judgment on the pleadings and, the following month, the student and parents moved for summary judgment, arguing that Montagino's claims were barred by the applicable one-year statute of limitations. The court agreed and dismissed the case in August 2010. Talikka received notice of the dismissal but did not inform Montagino.

**{¶ 69}** Beginning in May 2010, Montagino had attempted to contact Talikka about her case by phone and letters with no success. On August 3, 2011, having discovered that her case had been dismissed, Montagino sent Talikka a letter requesting a meeting. At that meeting on September 15, 2011, Talikka told her that her case had been dismissed as time-barred more than a year earlier.

**{¶ 70}** Montagino believed that had her case been filed in a timely manner, the outcome of the case might have been different. On September 19, 2011, she filed a complaint with the Lake County Bar Association against Talikka in which she alleged that his approach to her case had been "unprofessional" and "shoddy."

*Count Eight—John Ingram*

**{¶ 71}** At the beginning of December 2006, a vehicle driven by Emma Crouser struck pedestrian John Ingram and seriously injured him. Soon

thereafter, Ingram hired Talikka to handle the related personal-injury case for a one-third contingent fee. The agreement was memorialized in writing.

{¶ 72} On November 17, 2008, Talikka filed a complaint against Crouser in the Lake County Court of Common Pleas. In November 2009, Talikka settled Ingram's case for $300,000 and deposited the funds into his Northwest IOLTA account on November 20, 2009. Talikka disbursed approximately $160,000 to Ingram and collected $100,000 in attorney fees. After paying certain bills on Ingram's behalf, Talikka owed Ingram $39,196.70.

{¶ 73} Since January 2011, despite having placed the entire proceeds of the settlement into an IOLTA account in late 2009, and still owing Ingram tens of thousands of dollars, Talikka has regularly maintained a balance in his Northwest IOLTA account below the $39,196.70 to which Ingram is entitled. At points, that account has reached as low as $664.47 (on May 26, 2011), showing that Talikka misused Ingram's funds.

{¶ 74} Talikka never prepared a closing statement for Ingram. And since February 1, 2007, Talikka has neither maintained a client ledger of Ingram's funds contained in his IOLTA accounts, nor reconciled his IOLTA account on a monthly basis.

*Stipulations and Board Recommendation*

{¶ 75} The parties stipulated that Talikka committed multiple violations of 12 Rules of Professional Conduct. Talikka's misconduct, in the aggregate, amounted to 38 violations and caused harm to eight clients.

{¶ 76} The parties stipulated that Talikka committed three violations of Prof.Cond.R. 1.3 in his handling of three separate client matters by failing to file an appellate brief on behalf of Topazio, failing to respond to a motion to dismiss and a motion for judgment on the pleadings in Price's case, and failing to file a motion for judicial release for Cantrell's daughter. He failed to inform two clients that their cases had been dismissed, thereby violating Prof.Cond.R. 1.4(a)(3), and

failed to refund the unearned portion of the retainers to two other clients when they terminated his representation, in violation of Prof.Cond.R. 1.16(e). He also failed to respond to reasonable requests for information from his client in one matter in violation of Prof.Cond.R. 1.4(a)(4).

{¶ 77} Talikka also engaged in misconduct related to the handling of client funds. He failed to safeguard $10,000 belonging to Topazio in his client trust account in violation of Prof.Cond.R. 1.15(a). He failed to maintain records of the funds he should have been holding in his client trust account for five separate clients in violation of Prof.Cond.R. 1.15(a)(2) and failed to reconcile his trust account on a monthly basis for four clients in violation of Prof.Cond.R. 1.15(a)(5).

{¶ 78} In three personal-injury matters for which Talikka was to receive a contingency fee, he failed to have his clients sign closing statements in violation of Prof.Cond.R. 1.5(c)(2) and failed to promptly distribute all of the funds that his clients were entitled to receive in violation of Prof.Cond.R. 1.15(d).

{¶ 79} Talikka also stipulated that his conduct in five of the charged matters involved dishonesty, fraud, deceit, or misrepresentation in violation of Prof.Cond.R. 8.4(c) and that his conduct with respect to one of those clients was prejudicial to the administration of justice in violation of Prof.Cond.R. 8.4(d). He also acknowledged that his conduct in all eight of the charged counts adversely reflected on his fitness to practice law in violation of Prof.Cond.R. 8.4(h).

{¶ 80} As aggravating factors, the parties stipulated that Talikka clearly acted with a dishonest or selfish motive, demonstrated a pattern of misconduct, committed multiple offenses, and failed to make restitution. As mitigating factors, the parties stipulated that Talikka had no prior disciplinary violations and had shown evidence of good character.

{¶ 81} Although not stipulated to, the panel found, by clear and convincing evidence, that Talikka's victims were vulnerable and harm to them

resulted. Given the scope and severity of Talikka's misconduct, the majority's sanction improperly inflates the mitigating factors in this case while devaluing the aggravating factors, including the breadth of harm to vulnerable victims.

### *The mitigating factors are outweighed*
### *by the aggravating factors*

{¶ 82} In erroneously concluding that only a one-year period of probation is warranted, the majority has lost sight that the "primary purpose of the disciplinary process is not to punish the offender but to protect the public from lawyers who are unworthy of the trust and confidence essential to the attorney-client relationship." *Cleveland Metro. Bar Assn. v. Lockshin*, 125 Ohio St.3d 529, 2010-Ohio-2207, 929 N.E.2d 1028, ¶ 42, citing *Disciplinary Counsel v. Agopian*, 112 Ohio St.3d 103, 2006-Ohio-6510, 858 N.E.2d 368. Another important purpose of the process " 'is to ascertain whether the conduct of the attorney involved has demonstrated his unfitness to practice law, and if so to deprive him of his previously acquired privilege to serve as an officer of the court.' " *Ohio State Bar Assn. v. Weaver*, 41 Ohio St.2d 97, 100, 322 N.E.2d 665 (1975), quoting *In re Pennica*, 36 N.J. 401, 418, 177 A.2d 721 (1962). We must always be mindful of our obligations in these regards, but the majority fails to do so here.

{¶ 83} The majority minimizes Talikka's misconduct and contradicts itself in describing the etiology of the misconduct. On one hand, the majority suggests that the cause of Talikka's misconduct can be attributed to the "series of serious health problems" Talikka suffered during the time that he committed his misconduct. Majority opinion at ¶ 20. But on the other hand, the majority relies on Talikka's stipulations in which he admits to acting with a dishonest or selfish motive as the reasons for his misconduct. After reading the majority's opinion, the public—and the bar—will be confused as to whether Talikka committed his misconduct because he was suffering from serious health issues or because he was acting with a dishonest or selfish motive, as he so stipulated. It is difficult to

reconcile the majority's reasons for Talikka's misconduct and thus difficult to understand how the public will be protected from him absent a more stringent sanction.

**{¶ 84}** Despite not identifying the clear cause of Talikka's misconduct, the majority likens the present case to one that, upon examination, is inapposite: *Disciplinary Counsel v. Folwell*, 129 Ohio St.3d 297, 2011-Ohio-3181, 951 N.E.2d 775.

**{¶ 85}** In *Folwell*, we agreed with the board's finding that Folwell had engaged in a pattern of misconduct involving multiple offenses and that he clearly acted with a dishonest or selfish motive. *Id.* at ¶ 33; *see* BCGD Proc.Reg. 10(B)(1)(b), (c), and (d). There, we imposed a two-year suspension with the second year stayed on the same conditions as the majority imposes herein. *Id.* at ¶ 40.

**{¶ 86}** In the case at bar, the cause of Talikka's misconduct has not clearly been identified. The majority, however, equates Talikka's misconduct to Folwell's and mechanically applies the same sanction. In support of its comparison, the majority asserts that the facts in *Folwell* support a conclusion that the cases are substantially similar. It is the differences that illustrate the inapplicability of *Folwell*.

**{¶ 87}** Folwell, an attorney with approximately 20 years of experience, stipulated that he had engaged in a pattern of misconduct involving seven separate client matters and that his conduct had adversely reflected on his fitness to practice law. He failed to provide competent representation and failed to act with reasonable diligence by failing to timely obtain probate court approval of a personal-injury settlement for a client who was a minor, failed to maintain separate client ledgers for the funds held in his client trust account, failed to perform monthly reconciliations of his client trust account, and improperly used client funds.

**{¶ 88}** Folwell also unreasonably delayed performing contracted work for one client, led a client to believe that his case had been filed when it had not, accepted retainers from other clients, failed to perform the contracted work, and waited up to two and a half years after the clients terminated his representation to refund the unearned portion of his fees.

**{¶ 89}** As mitigating factors, the parties stipulated that Folwell had no prior disciplinary record and had cooperated in the disciplinary proceedings. *See* BCGD Proc.Reg. 10(B)(2)(a) and (d). We adopted the parties' recommended sanction of a two-year suspension with the second year stayed on the conditions that Folwell commit no further misconduct and complete a one-year period of monitored probation.

**{¶ 90}** Significantly, however, in *Folwell* we did not find that the victims were vulnerable, as the board has specifically done here. In the present case, the panel made an independent finding of the additional aggravating factor that Talikka's "victims were vulnerable and harm to them resulted."

**{¶ 91}** The majority glosses over the fact that the board adopted the panel's finding by stating that "although Talikka has caused harm to vulnerable clients, he has made restitution to those clients affected by his misconduct and pledged to pay interest on the funds that he wrongfully held as soon as he is presented with a calculation of the amounts due and owing." Majority opinion at ¶ 21. The majority's dismissive attitude toward the clients' vulnerability does not treat the misconduct with the gravity it deserves.

**{¶ 92}** We have repeatedly held that " '[t]he more vulnerable the client, the heavier is the obligation upon the attorney not to exploit the situation for his own advantage.' " *Disciplinary Counsel v. Freeman*, 106 Ohio St.3d 334, 2005-Ohio-5142, 835 N.E.2d 26, ¶ 13, quoting *Disciplinary Counsel v. Booher*, 75 Ohio St.3d 509, 510, 664 N.E.2d 522 (1996); *Disciplinary Counsel v. Moore*, 101 Ohio St.3d 261, 2004-Ohio-734, 804 N.E.2d 423, ¶ 17. Talikka's eight clients

relied on his legal advice and suffered harm because of his misconduct. He had an obligation to assist each of them through the legal process, not to exploit their naiveté. The finding of client vulnerability alone makes the present case distinguishable from *Folwell.*

{¶ 93} *Folwell* is also distinguishable from the present case because at the time the board issued its recommendation, Folwell had made restitution to his clients. The majority here erroneously affords great weight to the fact that Talikka has made restitution and pledged to pay interest on the funds. But at the time the board issued its recommended sanction in this case, Talikka had yet to pay restitution or interest. In fact, it was only *after* the board issued its recommendation that Talikka made restitution to the affected clients. Even today, however, Talikka has yet to pay any interest as required by both the panel and the board.

{¶ 94} The fact that Talikka did not make restitution until after the board issued its recommendation is a second reason to treat *Folwell* as inapposite here. But even more so, Talikka has yet to pay interest to his clients. This is a third and significant distinction from *Folwell:* Talikka was not willing to rectify his misconduct until ordered to do so, and that distinction warrants a different sanction than that imposed on Folwell.

{¶ 95} Especially disturbing is the majority's heavy reliance on certain selective parts of the report by Robert Kaplan, Ph.D., who conducted a psychological evaluation of Talikka. The majority gives credence to Talikka's voluntary participation in the evaluation and Talikka's decision to stipulate to the facts as well as to the charged misconduct. Moreover, the majority agrees with Dr. Kaplan's assessment that Talikka does not suffer from any mental-health or substance-abuse disorder, but that he simply took on more work than he could handle in order to maintain his self-esteem in the face of significant health problems. The majority also agrees with Dr. Kaplan's questionable conclusion

that Talikka has accepted full responsibility for his conduct and has accepted the limitations that his age and health impose on his work.

{¶ 96} But the majority's conclusions are drawn from a narrow interpretation of Dr. Kaplan's report that does not afford a full understanding of the psychologist's findings. Most notably, the majority omits several key statements from Dr. Kaplan's report that directly rebut the conclusion that Talikka has accepted full responsibility for his misconduct. First, Dr. Kaplan states in his report that Talikka "feels that he was betrayed by some of his clients" and "[h]e still feels angry" about the betrayal. The suggestion of "betrayal" by a client is unfounded and unsupported here. How can a client betray an attorney who has misappropriated funds, failed to perform agreed-upon work, or lied and ignored the client's needs?

{¶ 97} Second, the report also contains a statement by Talikka that his IOLTA account violations were attributable to errors made by his paralegal. Though Talikka purportedly "feels he is entirely responsible for what happened, since he made the choices that led to the errors," he feels "angry" with the paralegal. At minimum, these statements demonstrate that Talikka has not accepted full responsibility for his own failures as an attorney. Indeed, despite the abundance of errors in the accounting of IOLTA funds, these statements show that Talikka accepts responsibility with one hand, but with the other, he lays blame elsewhere.

{¶ 98} Furthermore, in reaching its conclusion that Talikka has accepted full responsibility for his misconduct, the majority gives more weight to that acceptance of responsibility than it does to the harm caused by Talikka's misconduct. That acknowledgment cannot outweigh the harm Talikka has caused.

{¶ 99} In *Toledo Bar Assn. v. Scott*, 129 Ohio St.3d 479, 2011-Ohio-4185, 953 N.E.2d 831, ¶ 20, we held that although an attorney's acknowledgment of the

wrongfulness of his conduct is an important consideration, it does not change the deceitful nature of the misconduct and the fact that the attorney took advantage of vulnerable clients. This holding is fitting herein. The majority should not be myopically focused on the fact that Talikka stipulated to causing harm to eight vulnerable clients and acting with a dishonest or selfish motive. Talikka's stipulation does not erase the severity of his misconduct and the harm caused.

{¶ 100} The majority also relies heavily on the five character letters from judges who attest to his honesty, good character, professionalism, zealous representation of his clients, and good reputation. I would afford very limited weight to these attestations. The authors of those letters undoubtedly believe what they write, but given the stipulations, we cannot ignore that their accolades to Talikka's honesty, professionalism, and zealous advocacy are not borne out in these eight cases and in fact may be outdated. Clients reported, and Talikka agreed, that he wrongfully kept their money and failed to communicate with them. One client reported that she felt physically threatened by Talikka after she disagreed with him. The misconduct at issue here cannot be overlooked entirely because of Talikka's conduct in other cases, which evidently gave rise to the character letters.

{¶ 101} The majority imposes a two-year suspension from the practice of law in Ohio with the second year stayed on certain conditions, as permitted by Gov. Bar R. V(9)(B). But Talikka's misconduct warrants a period of indefinite suspension with reinstatement contingent upon his payment in full of the interest owed to his clients and upon his entry into a contract with the Ohio Lawyers Assistance Program and compliance with its terms. Those conditions are not excessive given the nature and scope of the misconduct here and can only help Talikka regain proper control over his practice while protecting the public from any additional harm. It is baffling that despite the loss of tens of thousands of dollars belonging to his clients, repeated neglect of clients' cases, and repeated

incidents showing disrespect to clients and the oath Talikka took as an attorney, the majority fails to impose them in this case. I must therefore dissent.

LANZINGER and FRENCH, JJ., concur in the foregoing opinion.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Philip A. King, Assistant Disciplinary Counsel, for relator.

Koblentz & Penvose, L.L.C., Richard S. Koblentz, Bryan L. Penvose, and Kevin R. Marchaza, for respondent.

_____